# United States Court of Appeals for the Federal Circuit

2006-1524, -1525

WHEATLAND TUBE COMPANY
and ALLIED TUBE & CONDUIT CORPORATION,

Plaintiffs-Appellees,

v.

UNITED STATES,

Defendant-Appellant,

and

SAHA THAI STEEL PIPE COMPANY, LTD.,

Defendant-Appellant.

Roger B. Schagrin, Schagrin Associates, of Washington, DC, argued for plaintiffs-appellees. Of counsel were Michael J. Brown and Brian E. McGill.

Patricia M. McCarthy, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellant, United States. With her on the brief was Peter D. Keisler, Assistant Attorney General. Of counsel on the brief were John D. McInerney, Chief Counsel, and Irene H. Chen, Attorney International, Office of General Counsel, Office of Chief Counsel for Import Administration, United States Department of Commerce, of Washington, DC. Of counsel was Ada E. Bosque.

David J. L. Mortlock, O'Melveny and Myers LLP, of Washington, DC, for defendant-appellant, Saha Thai Steel Pipe Company, Ltd. With him on the brief was Greyson Bryan, of Los Angeles, California.

Donald B. Cameron, Kaye Scholer LLP, of Washington, DC, for amici curiae, Dongbu Steel Co., Ltd., et al. With him on the brief were Julie C. Mendoza, R. Will Planert, Jeffrey S. Grimson, Brady W. Mills, and Sarah M. Sharp.

Spencer S. Griffith, Akin Gump Strauss Hauer & Feld, LLP, of Washington DC, for amicus curiae, Posco and Pohang Coated Steel Co., Ltd. With him on the brief were J. David Park and Lisa W. Ross.

Appealed from: United States Court of International Trade

Judge Gregory W. Carman

# United States Court of Appeals for the Federal Circuit

2006-1524, -1525

WHEATLAND TUBE COMPANY
and ALLIED TUBE & CONDUIT CORPORATION,

Plaintiffs-Appellees,

v.

UNITED STATES,

Defendant-Appellant,

and

SAHA THAI STEEL PIPE COMPANY, LTD.,

Defendant-Appellant.

_____

DECIDED: July 25, 2007

_____

Before RADER, Circuit Judge, ARCHER, Senior Circuit Judge, and GAJARSA, Circuit Judge.

GAJARSA, Circuit Judge.

This is a statutory construction and agency deference case. The issue before us is whether Commerce's interpretation of "United States import duties" under 19 U.S.C. § 1677a(c)(2)(A) includes "safeguard duties" from § 201 of the Trade Act of 1974. The United States (the "government" or "Commerce") and Saha Thai Steel Pipe Company, LTC ("Saha Thai") appeal from the Court of International Trade's judgment on the administrative record in favor of Wheatland Tube Company and Allied Tube & Conduit Corporation (collectively "Wheatland Tube"). The trial court held that Commerce's

interpretation of 19 U.S.C. § 1677a(c)(2)(A), namely that § 201 safeguard duties are not deducted from the export price in calculating the antidumping duty margin, was unreasonable and not in accordance with the law. See Wheatland Tube Co. v. United States, 414 F. Supp. 2d 1271 (Ct. Int'l Trade 2006). We reverse the Court of International Trade because we find Commerce's interpretation of § 1677a(c)(2)(A) reasonable and therefore in accordance with law.

## I. BACKGROUND

Saha Thai is an exporter of circular welded carbon steel pipes and tubes ("pipe") from Thailand. Wheatland Tube is a domestic producer of steel pipe. At the Court of International Trade, Wheatland Tube contested Commerce's treatment of § 201 safeguard duties in its determination of Saha Thai's antidumping margin.

Section 201 of the Trade Act of 1974, 19 U.S.C. § 2251, permits the President of the United States to impose safeguard duties on imported merchandise if the merchandise "is being imported into the United States in such increased quantities as to be a substantial cause of serious injury, or the threat thereof, to the domestic industry producing an article like or directly competitive with the imported article." On March 5, 2002, through Proclamation No. 7529, the President imposed § 201 safeguard duties on imports of certain steel products, including the pipe that is the subject of this appeal. See 67 Fed. Reg. 10,533 (Mar. 7, 2002). Proclamation 7529 mandated payment of an additional 15% duty on covered steel products entered between March 20, 2002 through March 19, 2003. See Proclamation 7529, 67 Fed. Reg. at 10,590.

On April 21, 2003, Commerce issued a notice of initiation of an antidumping duty administrative review for circular welded carbon steel pipes and tubes from Thailand.[1] The review involved a single producer of the subject pipe, Saha Thai. Wheatland Tube, a U.S. producer of pipe, was the petitioner in the administrative review of Saha Thai's entries. The period of review ("POR") covered merchandise entered by Saha Thai between March 1, 2002 and February 28, 2003. Thus, the POR covered almost the entire period of time in which the President's Proclamation 7529 was in effect.

Pursuant to 19 U.S.C. § 1677a(c)(2)(A) (emphasis added), which statute is the focus of this case, Commerce is required to decrease an exporter's export price[2] (the "EP") by the amount of "any additional costs, charges, or expenses, and United States import duties, which are incident to bringing the subject merchandise from the original place of shipment in the exporting country to the place of delivery in the United States." During Commerce's review of Saha Thai's entries, Commerce considered whether it should deduct from the EP the § 201 duties Saha Thai paid upon importation of the subject merchandise into the United States. Because Commerce had never before addressed this issue—whether § 201 duties are deducted from the EP in determining an antidumping margin—Commerce postponed deducting the § 201 duties pending

---

[1]    See Initiation of Antidumping and Countervailing Duty Administrative Reviews, 68 Fed. Reg. 19,498 (Apr. 21, 2003).

[2]    Title 19 U.S.C. § 1677a(a) defines "Export price" as

> the price at which the subject merchandise is first sold (or agreed to be sold) before the date of importation by the producer or exporter of the subject merchandise outside of the United States to an unaffiliated purchaser in the United States or to an unaffiliated purchaser for exportation to the United States, as adjusted under subsection (c) of this section.

public notice and comment on the issue of the treatment of § 201 duties in antidumping duty determinations.[3]

After considering the comments and responses received during the notice and comment period, Commerce ruled that § 201 safeguard duties are not "United States import duties" for the purposes of § 1677a(c)(2)(A) and should therefore not be deducted from the EP in calculating the antidumping margin.[4] Commerce based its ruling on the legislative history of § 1677a(c)(2)(A), on its established practice to not deduct remedial duties from the EP, and on its obligation to avoid collecting double remedial remedies. SWR Korea, 69 Fed. Reg. at 19,157-59.

Commerce applied its ruling in SWR Korea to the review of Saha Thai's entries and determined that Saha Thai's § 201 safeguard duties were not "United States import duties" that were required to be deducted from Saha Thai's EP under 19 U.S.C. § 1677a(c)(2)(A).[5] As a result, Commerce calculated Saha Thai's weighted average dumping margin to be a de minimis margin of 0.17% and found that Saha Thai's cash deposit rate for the POR was zero.

Wheatland Tube contested Commerce's treatment of § 201 safeguard duties in calculating Saha Thai's antidumping margin at the Court of International Trade, arguing that § 201 duties are "United States import duties" under 19 U.S.C. § 1677a(c)(2)(A)

---

[3] See Notice of Antidumping Proceedings: Treatment of Section 201 Duties and Countervailing Duties, 68 Fed. Reg. 53,104 (Sept. 9, 2003) ("Treatment of § 201 Duties").

[4] See Stainless Steel Wire Rod from the Republic of Korea, 69 Fed. Reg. 19,153, 19,157-59 (Apr. 12, 2004) ("SWR Korea").

[5] See Certain Welded Carbon Steel Pipes and Tubes from Thailand, 69 Fed. Reg. 61,649 (Oct. 20, 2004) ("Final Results").

and must therefore be deducted from the EP and that Commerce's treatment of § 201 duties usurped the President's power and authority to impose § 201 duties.

The Court of International Trade agreed with Wheatland Tube and determined: "By failing to deduct § 201 duties from EP [the export price], Commerce improperly negates the § 201 duty imposed by the President, artificially decreases Respondent's AD margin, and upsets the balance between § 201 duties and AD duties." Wheatland, 414 F. Supp. 2d at 1283. Based on its own statutory construction, the court found that Commerce's interpretation was "unreasonable and not in accordance with the law." Id. at 1279.

The court analyzed Commerce's interpretation of the statutory text "United States import duties" under 19 U.S.C. § 1677a(c)(2)(A) according to the two-step test set forth by the Supreme Court in Chevron U.S.A., Inc. v. Natural Resources Defense Council, 467 U.S. 837 (1984). Under the first step of Chevron, the court found that Congress had not "directly spoken to the precise question at issue," 467 U.S. at 842, because Congress did not define "import duties." Wheatland Tube, 414 F. Supp. 2d at 1280. Under the second step of Chevron, the court determined that it was not reasonable for Commerce to interpret the statute to exclude § 201 safeguard duties because such a construction conflicted with the trade remedy statutory scheme by nullifying antidumping relief.

The trial court entered final judgment on May 16, 2006. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(5).

## II.  ANALYSIS

This court reviews the judgment of the Court of International Trade regarding Commerce's interpretation of § 1677a(c)(2)(A) by reapplying the same statutory

standard applied by the court. See Atl. Sugar, Ltd. v. United States, 744 F.2d 1556, 1559 n.10 (Fed. Cir. 1984). Accordingly, this court will uphold Commerce's determinations, findings, and conclusions unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with the law." 19 U.S.C. § 1516a(b)(1)(B)(i).

**A.**

Because the issue before this court is Commerce's statutory interpretation of § 1677a(c)(2)(A), we determine whether Commerce's statutory interpretation is entitled to deference pursuant to Chevron. 467 U.S. at 842-43. Under Chevron, this court must conduct a two-step analysis to determine whether Commerce's interpretation and application of the antidumping statute at issue "is in accordance with the law." The first step of Chevron is to determine "whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." Id. This court reaches step two of Chevron only "if the statute is silent or ambiguous with respect to the specific issue." Id. at 843.

As applied to this case, under Chevron step one, it is clear that Congress has not defined or explained the meaning or scope of "United States import duties" as set forth in 19 U.S.C. § 1677a(c)(2)(A). More specifically, the Tariff Act, the Trade Act, and the legislative histories of those acts do not explain whether § 201 safeguard duties are to be considered "United States import duties" for purposes of determining the EP and calculating dumping margin under 19 U.S.C. § 1677a(c)(2)(A). Based on Congress' silence on this particular issue, the Court of International Trade correctly found that § 1677a(c)(2)(A) was ambiguous with respect to whether § 201 safeguard duties are

"United States import duties" because "Congress did not define 'United States import duties.'" Wheatland Tube, 414 F. Supp. 2d at 1280. Thus, because Congress has not "directly spoken to the precise question at issue," this court finds that the statute is ambiguous and proceeds to step two of Chevron.

**B.**

Under Chevron step two, if Congress expressly or implicitly delegated authority to an agency to interpret a statute by authorizing the agency to issue substantive rules or regulations, this court must give deference to the agency's interpretation of the statute as promulgated in the rules or regulations if the agency's interpretation is "reasonable." 467 U.S. at 843-44.

The Supreme Court unequivocally held in United States v. Mead Corp., 533 U.S. 218, 226-27 (2001), that an agency's statutory interpretation "qualifies for Chevron deference" if the interpretation is the result of the agency's formal notice-and-comment rulemaking process:

> We hold that administrative implementation of a particular statutory provision qualifies for Chevron deference when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority. Delegation of such authority may be shown in a variety of ways, as by an agency's power to engage in . . . notice-and-comment rulemaking . . . .

In the case before us, Commerce expressly used its formal notice-and-comment rulemaking authority from Congress to determine whether § 201 safeguard duties are "United States import duties" for purposes of 19 U.S.C. § 1677a(c)(2)(A). On September 9, 2003, Commerce posted notice requesting comments on the treatment of § 201 duties in determining the EP for calculating dumping margin. See Treatment of § 201 Duties, 68 Fed. Reg. at 53,104. At the conclusion of the notice-and-comment

period, Commerce issued its final ruling on April 12, 2004, determining that § 201 safeguard duties are not "United States import duties" for purposes of 19 U.S.C. § 1677a(c)(2)(A) and therefore should not be deducted from the EP in calculating dumping margin.  See SWR Korea, 69 Fed. Reg. at 19,157-59.  Because Commerce's interpretation that "United States import duties" do not include § 201 safeguard duties was the result of its formal notice-and-comment rulemaking process, Commerce's interpretation is entitled to deference as required by step two of Chevron if its interpretation is reasonable.

## C.

Under step two of Chevron, if an agency's statutory interpretation promulgated under the authority delegated it by Congress is "reasonable" it is "binding [o]n the courts unless procedurally defective, arbitrary or capricious in substance, or manifestly contrary to the statute."  467 U.S. at 844; Administrative Procedure Act, 5 U.S.C. § 706(2)(A), (D).  This court is "obliged to accept [Commerce's] position" on the issue of § 1677a(c)(2)(A) and § 201 safeguard duties as set forth in the final results of its formal notice-and-comment proceeding if Commerce's "interpretation is reasonable." Mead Corp., 533 U.S. at 229 (referring to Chevron, 467 U.S. at 842-45).  Thus, a court must defer to an agency's reasonable interpretation of a statute and must not substitute its own judgment for that of the agency even if the court might have preferred another interpretation and even if the agency's interpretation is not the only reasonable one. See Koyo Seiko Co. v. United States, 36 F.3d 1565, 1570 (Fed. Cir. 1994); PPG Indus., Inc. v. United States, 928 F.2d 1568, 1571 (Fed. Cir. 1991).  Furthermore, this court gives Commerce's interpretation of antidumping laws significant deference because of its special expertise in administering antidumping duty law.  See Ta Chen Stainless

Steel Pipe, Inc. v. United States, 298 F.3d 1330, 1335 (Fed. Cir. 2002); Koyo Seiko, 36 F.3d at 1570.

In the present case, for the reasons set forth herein, we hold that the trial court erred when it applied step two of Chevron because Commerce's interpretation—that § 201 safeguard duties are not "United States import duties" and thus are not deducted from the EP in calculating the dumping margin—is reasonable. Because Commerce's interpretation of § 1677a(c)(2)(A) is reasonable and therefore in accordance with the law, the trial court should have deferred to Commerce pursuant to Chevron and should not have substituted its own interpretation for Commerce's interpretation.

To determine whether Commerce's interpretation of "United States import duties" is reasonable, we may look to "the express terms of the provisions at issue, the objectives of those provisions, and the objectives of the antidumping scheme as a whole." NSK Ltd. v. United States, 217 F. Supp. 2d 1291 (Ct. Int'l Trade 2002).

In reaching its interpretation of "United States import duties," Commerce first looked to the legislative history of the Antidumping Act of 1921 from which § 1677a derives to determine the objectives of § 1677a and the objectives of the antidumping scheme in general. Commerce found that the legislative history referred to "United States import duties" as normal customs duties and referred to antidumping duties as "special dumping duties" and that "special dumping duties" were distinguished and treated differently from normal customs duties. SWR Korea, 69 Fed. Reg. at 19,159 (referring to S. Rep. No. 67-16 at 4 (1921)). Based on Congress' distinction that "special dumping duties" such as antidumping duties are not "United States import duties," Commerce determined that Congress did not intend all duties to be considered "United States import duties." Id. Commerce concluded that Congress

recognized that at least some duties implementing trade remedies—including at least antidumping duties—are special duties that should be distinguished from ordinary customs duties. Accordingly, Commerce consistently has treated AD duties as special duties not subject to the requirement to deduct "United States import duties" (normal customs duties) from U.S. prices in calculating dumping margins.

Id. Commerce noted that Congress had recently specifically endorsed Commerce's interpretation of § 1677a(c)(2)(A) when Congress stated that a similar provision dealing with duty absorption during administrative reviews was "not intended to provide for the treatment of antidumping duties as a cost." Id. (citing Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103-316, vol. 1 at 885 (1994)). Finally, Commerce cited to a series of cases in which the practice of not considering antidumping duties as "United States import duties" had been repeatedly upheld. Id.

Second, after determining that Congress intended "special dumping duties" to be treated differently than normal customs duties, Commerce compared § 201 safeguard duties to both normal customs duties and antidumping duties in order to determine how Congress would have intended § 201 duties to be treated in achieving the purposes of the antidumping objectives. Commerce found several significant similarities between § 201 safeguard duties and antidumping duties and determined that § 201 duties are "special dumping duties" because they are "more like AD [antidumping duties] in purpose and function than they are like ordinary customs duties." Id.

Like antidumping duties, Commerce found that § 201 safeguard duties are remedial duties that provide relief from the adverse effects of imports. Id. Antidumping duties aim to remedy sales by a foreign exporter in the U.S. market at less than fair value. 19 U.S.C. § 1673(1). Similarly, § 201 safeguard duties aim to remedy the injurious effects on the U.S. industry of a significant surge in imports. 19 U.S.C. § 2251. Normal customs duties, in contrast, have no remedial purpose. They are imposed

regardless of whether the U.S. industry is suffering adverse effects as a result of imports.

In addition, Commerce found that antidumping duties and § 201 safeguard duties, unlike normal customs duties, are imposed based on almost identical findings that domestic industry is being injured or threatened with injury due to the imported merchandise. SWR Korea, 69 Fed. Reg. at 19,159-60. For example, in order for an antidumping duty to be imposed, a domestic industry must be found to be materially injured or threatened with material injury by reason of dumped imports. 19 U.S.C. § 1671(a)(2). Likewise, the President may impose § 201 safeguard duties only if a domestic producer is experiencing "serious injury, or threat thereof" because merchandise "is being imported into the United States in such increased quantities." 19 U.S.C. § 2251(a).

Commerce also found that § 201 safeguard duties are like antidumping duties and unlike normal customs duties because they provide only temporary relief from the injurious effects of imports. SWR Korea, 69 Fed. Reg. at 19,159. Section 201 safeguard duties are generally limited to four years. 19 U.S.C. § 2253(e)(1)(A). Similarly, antidumping duty orders provide for a termination of antidumping duties after five years, unless the government determines that revocation of the order would lead to dumping and domestic industry would suffer material injury. 19 U.S.C. § 1675(c)(1). Normal customs duties, however, have no termination provision and are permanent unless modified by Congress.

Given the similarities between antidumping duties and § 201 safeguard duties and given the fact that § 201 safeguard duties were not enacted until 1974[6] and therefore could not have been considered either "United States import duties" under § 1677a(c)(2)(A) as originally enacted in 1921 or "special dumping duties," it was reasonable for Commerce to conclude that § 201 safeguard duties are more like antidumping duties "in purpose and function than they are like ordinary customs duties." SWR Korea, 69 Fed. Reg. at 19,159. Because of Commerce's finding that § 201 safeguard duties are like antidumping duties for purposes of § 1677a(c)(2)(A), it was reasonable for Commerce to treat § 201 safeguard duties as antidumping duties and not deduct them from the EP when calculating dumping margin.

Finally, after finding that § 201 safeguard duties were similar to antidumping duties for purposes of calculating dumping margin, Commerce found that if § 201 safeguard duties were included as "United States import duties" for purposes of determining the EP pursuant to § 1677a(c)(2)(A), then in certain situations Commerce would improperly collect § 201 safeguard duties twice. SWR Korea, 69 Fed. Reg. at 19,160; Final Results, 69 Fed. Reg. at 91,949 (stating it "effectively would collect the 201 duties a second time."). Commerce explained:

> Where there is a pre-existing dumping margin, deducting the 201 duties from U.S. prices effectively would collect the 201 duties twice—first as 201 duties, and a second time as an increase in that dumping margin. Where there was no pre-existing dumping margin, the deduction of 201 duties from U.S. prices in an AD proceeding could create a margin. Nothing in the legislative history of section 201 or the AD law indicates that Congress intended such results.

---

[6]    See Section 201 of the Trade Act of 1974, 19 U.S.C. § 2251.

SWR Korea, 69 Fed. Reg. at 19,160. Commerce's conclusion that including § 201 safeguard duties as "United States import duties" would improperly lead it to collect a double remedy is also reasonable.

To be in accordance with the law as set forth by the Supreme Court in Chevron, Commerce's determination that § 201 safeguard duties are not "import duties" under § 1677a(c)(2)(A) need only be based on a reasonable interpretation of the statute. In light of the legislative history of the Antidumping Duty Act of 1921, the similarities between antidumping duties and § 201 safeguard duties, and the likelihood that deducting § 201 safeguard duties from the EP would result in collecting a double remedy, we hold that Commerce's interpretation that "United States import duties" does not include § 201 safeguard duties for the purposes of determining the EP and calculating the dumping margin is reasonable.

### D.

The Court of International Trade found that Commerce's interpretation of § 1677a(c)(2)(A) was unreasonable because it did not "satisfy the objectives of the statute or trade remedy legislation—in general—and [was], therefore, not in accordance with the law." Wheatland Tube, 414 F. Supp. 2d at 1281. The trial court therefore did not give deference to Commerce's interpretation under Chevron. We find that the trial court erred when it set aside Commerce's ruling.

The trial court offered three key reasons for finding Commerce's interpretation of § 1677a(c)(2)(A) unreasonable: 1) § 201 safeguard duties and antidumping duties are not designed to remedy the same harms; 2) the President would not expect Commerce to re-calculate antidumping duties to account for § 201 safeguard duties; and 3) failing

to deduct § 201 safeguard duties from the EP improperly negates the § 201 duty imposed. Id. at 1282-86.

Unlike Commerce, the trial court determined that § 201 safeguard duties are unlike antidumping duties because they remedy "distinct harms" and redress "dissimilar trade distortions." Id. at 1284, 1286. Thus, the trial court concluded that § 201 safeguard duties should not be treated like antidumping duties and should be included in the EP when calculating dumping margin. The trial court's distinction is without merit. For example, antidumping duties and countervailing duties are different in as much as they remedy "distinct harms" and redress "dissimilar trade distortions," yet neither one is considered "United States import duties" under § 1677a(c)(2)(A) and neither one is deducted from the EP in calculating dumping margin. Antidumping duties remedy the harm of sales by a foreign exporter in the U.S. market at less than fair value. 19 U.S.C. § 1673(1). Countervailing duties remedy unfair competitive advantages that foreign exporters have over domestic producers as a result of foreign countervailable subsidies. 19 U.S.C. § 1671. Section 201 safeguard duties remedy the injurious effects on domestic producers of a surge in imports. 19 U.S.C. § 2251. While all of these three types of duties remedy "distinct harms" they are all directed at the same overarching purpose—protecting the bottom line of domestic producers. The trial court's distinction between antidumping duties and § 201 safeguard duties is, therefore, insufficient to overcome Commerce's formal notice-and-comment ruling that § 201 safeguard duties are similar enough in "purpose and effect" to antidumping duties to warrant similar treatment under § 1677a(c)(2)(A).

The trial court also found Commerce's interpretation unreasonable because it concluded that "the President would not expect that Commerce would revise AD duties

2006-1524, -1525                    14

downward in response to the President's action." Wheatland Tube, 414 F. Supp. 2d at 1283. This statement is based on an erroneous and unsupported presumption by the trial court that the President had an intent regarding the calculation of antidumping margin at the time it imposed § 201 safeguard duties. However, there is no record establishing how the executive branch would treat § 201 safeguard duties in calculating dumping margin. If there had been such executive branch intent, then Commerce would not have had to undergo the seven-month notice-and-comment process it undertook to formulate its ruling on this particular issue. This reason does not sufficiently explain why and how Commerce's interpretation of § 1677a(c)(2)(A) is unreasonable and therefore not accorded Chevron deference.

Finally, the trial court concluded that Commerce's failure to deduct § 201 safeguard duties from the EP improperly negates the effect of § 201 safeguard duties and upsets the balance between § 201 safeguard duties and antidumping duties. This reason too is flawed. Commerce determined that the balance between § 201 safeguard duties and antidumping duties lies in the central purpose of both duties—to prevent harm to domestic industry's bottom line. Section 201 safeguard duties and antidumping duties remedy injuries that substantially overlap. Both dumping (which is remedied by imposing antidumping duties) and import surges (which is remedied by imposing § 201 duties) tend to increase the supply of subject merchandise in the United States and lower its price. Injury in both cases includes lost sales, declining prices, declining market share, and declining profits. Compare 19 U.S.C. § 1677(7) (listing factors ITC considers in making material injury determination for imposition of antidumping duties) with 19 U.S.C. § 2252(c) (listing factors ITC considers in making serious injury determination for imposition of § 201 safeguard duties). The remedy provided by both

duties is the same—the imposition of duties on foreign exports, which is intended to raise the United States market price for the subject merchandise and thereby increase sales and profits of domestic producers.

Unlike antidumping duties, § 201 safeguard duties have a wide-reaching scope. An antidumping duty order covers subject merchandise from one specified country. The antidumping duty orders covering the subject merchandise in this appeal extend to only four countries. By contrast, § 201 safeguard duties are imposed upon subject merchandise from every exporting country, barring special exceptions. For the subject merchandise at issue in this case, the § 201 safeguard duties were imposed on twenty exporting countries. Moreover, many foreign producers and exporters who are subject to safeguard duties may not be subject to simultaneous antidumping duties. In the case at hand, at most only four of the twenty exporting countries were subject to both antidumping duties and the § 201 safeguard duties. Thus, considering the wide-reaching effect of § 201 safeguard duties on subject merchandise, it is reasonable to assume that such duties will have the intended effect of raising United States prices and presumably reducing or eliminating dumping. An increase in the United States price is one way in which a foreign exporter may reduce or eliminate its dumping margin.

Commerce discussed the balance between § 201 safeguard duties and antidumping duties when it noted the possibility that deducting § 201 safeguard duties from the United States price in some instances may improperly result in calculating an artificial dumping margin for a foreign exporter who had not engaged in dumping before Commerce deducted the § 201 safeguard duty. SWR Korea, 69 Fed. Reg. at 19,160.

We addressed the balance between § 201 safeguard duties and antidumping duties in Nucor Corp. v. United States, 414 F.3d 1331 (Fed. Cir. 2005). In Nucor Corp.,

we focused on whether domestic producers were suffering injury from dumping given the remedial effect of § 201 safeguard duties. 414 F.3d at 1337. We found that domestic producers were not suffering or being threatened with material injury "[b]ecause the imposition of section 201 tariffs had such a dramatic impact on the industry" as to essentially eliminate any injury from dumped imports. Id. Thus, safeguard duties can reduce or eliminate the injury from dumping because, to a large extent, the overarching injury remedied by safeguard duties is similar to the overarching injury remedied by antidumping duties. To assess both a safeguard duty and an antidumping duty on the same imports without regard to the safeguard duty, would be to remedy substantially overlapping injuries twice. The balance between § 201 safeguard duties and antidumping duties is reached when the imposition of § 201 safeguard duties ameliorates the very injury that justifies the antidumping duty order in the first instance.

In its final ruling addressing its interpretation of § 1677a(c)(2)(A), Commerce stated that the balance between § 201 safeguard duties and antidumping duties had been set by the President:

> any adjustment for the potential overlap between 201 and AD remedies is to be made by the President in setting the level of the 201 duties. Once the President has struck this balance, it is not Commerce's place to upset that balance by subtracting the 201 duties from U.S. prices in calculating dumping margins, providing relief beyond what the President approved. There is absolutely no indication in the Presidential Proclamation [7529] placing 201 duties on certain imports of steel that the President believed that Commerce effectively would increase those duties by taking them into account in calculating subsequent dumping margins.

SWR Korea, 69 Fed. Reg. at 19,160.

There is no support for the trial court's conclusion that Commerce's interpretation of § 1677a(c)(2)(A) negates the effect of § 201 safeguard duties or upsets the balance between § 201 safeguard duties and antidumping duties. To the contrary, because

§ 201 safeguard duties may reduce or eliminate the injury that is required for an antidumping duty to continue and because deducting § 201 safeguard duties from the EP may create an artificial dumping margin, Commerce would be punitively collecting additional antidumping duties if it were to increase dumping margins by deducting § 201 safeguard duties when calculating dumping margins. Thus, Commerce's interpretation gives effect to the very purpose of § 201 safeguard duties and preserves the balance between § 201 safeguard duties and antidumping duties.

For the reasons stated herein, the trial court's reasoning is insufficient to overcome the deference that should be accorded to Commerce's interpretation of § 1677a(c)(2)(A), which interpretation is clearly reasonable and which interpretation was the result of a formal and thorough administrative rulemaking process. Because we find Commerce's interpretation of "United States import duties" under § 1677a(c)(2)(A) reasonable, we find that the trial court erred by not deferring to Commerce's interpretation as required under Chevron.

## III. CONCLUSION

Based on the foregoing reasons, we hold that Commerce's interpretation of "United States import duties" in § 1677a(c)(2)(A) is reasonable and that the Court of International Trade erred when it did not defer to Commerce's reasonable

interpretation. We therefore reverse the judgment of the Court of International Trade and remand this case for a calculation of Saha Thai's EP and dumping margin in a manner consistent with this opinion.

<u>REVERSED and REMANDED</u>

No costs.