# United States Court of Appeals for the Federal Circuit

---

**APEX EXPORTS, AND
FALCON MARINE EXPORTS LIMITED,**
*Plaintiffs-Appellees,*

**v.**

**UNITED STATES,**
*Defendant-Appellee,*

AND

**AD HOC SHRIMP TRADE ACTION COMMITTEE,**
*Defendant-Appellant,*

AND

**AMERICAN SHRIMP PROCESSORS
ASSOCIATION,**
*Defendant.*

---

2014-1234

---

Appeal from the United States Court of International Trade in Nos. 1:11-cv-00291-RWG and 1:11-cv-00286-RWG, Senior Judge Richard W. Goldberg.

---

Decided: February 5, 2015

---

LIZBETH R. LEVINSON, Kutak Rock LLP, of Washington, DC, argued for plaintiff-appellees. With her on the brief was RONALD M. WISLA.

JOSHUA E. KURLAND, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellee. With him on the brief were STUART F. DELERY, Assistant Attorney General, JEANNE E. DAVIDSON, Director, and PATRICIA M. MCCARTHY, Assistant Director. Of counsel on the brief was SCOTT D. MCBRIDE, Senior Attorney, Office of the Chief Counsel for Trade Enforcement & Compliance, United States Department of Commerce, of Washington, DC.

DAVID A. YOCIS, Picard Kentz & Rowe LLP, of Washington, DC, argued for defendant-appellant. With him on the brief were ANDREW W. KENTZ, JORDAN C. KAHN, and NATHANIEL MAANDIG RICKARD.

———————————

Before NEWMAN, CLEVENGER, and DYK, *Circuit Judges.*

CLEVENGER, *Circuit Judge.*

Ad Hoc Shrimp Trade Action Committee appeals the final decision of the Court of International Trade ("CIT"), sustaining the refusal by the Department of Commerce ("Commerce") to deduct antidumping duties when calculating an export price. *Apex Exports v. United States*, No. 11-00291, 2013 WL 6978901 (Ct. Int'l Trade Dec. 31, 2013). This court has jurisdiction under 28 U.S.C. § 1295(a)(5) (2012). Because Commerce's interpretation of the antidumping statute is reasonable, we affirm.

I

Commerce is responsible for imposing antidumping duties. These duties are levied when foreign merchandise is sold in the United States at less than fair value and

such sales pose a threat to domestic industry. 19 U.S.C. § 1673 (2012). Commerce calculates the antidumping duty using the export price methodology. *See Certain Frozen Warmwater Shrimp from India*, 76 Fed. Reg. 12025, 12028 (Mar. 4, 2011) (prelim. admin. review, partial rescission, and prelim. determination). Under this method, Commerce determines whether subject merchandise is being sold at less than fair value. If it is, Commerce determines how much less, and then assesses antidumping duties to make up the difference. 19 U.S.C. § 1673.

For this calculation, Commerce first determines the "export price" ("EP"). This is the price that the first unaffiliated U.S. buyer pays for the subject merchandise. 19 U.S.C. § 1677a(a) (2012). Then, Commerce calculates the "normal value" ("NV"). This is treated as the fair value, and it is the price at which the subject merchandise is sold in the exporting country. 19 U.S.C. § 1677b(a)(1)(B)(i) (2012). If EP is lower than NV, and it poses a threat to U.S. industry, then Commerce assesses a duty "equal to the amount by which the normal value exceeds the export price." 19 U.S.C. § 1673. In practice, Commerce sets the duty by determining the dumping margin. A weighted average dumping margin is the difference between NV and EP, then divided by EP ($(NV - EP)/EP$). 19 U.S.C. § 1677(35) (2012).

However, it is not quite that simple. The goal of this calculation is to allow Commerce to compare the fair value of the merchandise to the price charged in the U.S. Therefore, both EP and NV are subject to adjustments, so that they closely reflect the price of subject merchandise at a common point in the chain of commerce. 19 U.S.C. § 1677b(a)(1)(B); 19 U.S.C. § 1677a(c)(2); 19 U.S.C. § 1677b(a)(6). As it pertains to this appeal, EP is reduced by the cost of bringing merchandise to the U.S.

Specifically,

> [t]he price used to establish export price . . . shall
> be . . . reduced by . . . the amount, if any, included
> in such price, attributable to any additional costs,
> charges, or expenses, and United States import
> duties, which are incident to bringing the subject
> merchandise from the original place of shipment
> in the exporting country to the place of delivery in
> the United States . . . .

19 U.S.C. § 1677a(c)(2). This includes, for example, freight expenses, U.S. customs duties, and port charges. *Id.*; 76 Fed. Reg. at 12028. Because these are costs incident to bringing all merchandise into the U.S., one would expect U.S. prices to be higher to account for those expenses. Those price increases do not have a bearing on the fair value of merchandise. Therefore, the statute instructs Commerce to deduct them from EP. NV is subject to similar adjustments. 19 U.S.C. § 1677b(a)(6). The overall goal is to arrange an apples-to-apples comparison between the domestic and foreign price of merchandise. Then Commerce can correct for dumping by imposing an additional duty.

## II

In 2005, Commerce made a final determination that certain shrimp imported from India were likely being sold in the U.S. at less than fair market value. *Certain Frozen Warmwater Shrimp from India*, 70 Fed. Reg. 5147 (Feb. 1, 2005) (notice of amended final determination). During the fifth administrative review of that antidumping order, shrimp exporters Apex Exports ("Apex") and Falcon Marine Exports Limited ("Falcon") were selected as individual respondents. Commerce assessed a 2.31% and 1.36% dumping margin for Apex and Falcon, respectively. *Certain Frozen Warmwater Shrimp from India*, 76 Fed. Reg. 41203, 41205 (July 13, 2011) (final admin. review, partial rescission, and final determination).

Commerce calculated the EP of merchandise sold by Apex and Falcon during the period of this fifth administrative review. Commerce started with the packed price of the shrimp charged to the first unaffiliated purchaser in the U.S. 76 Fed. Reg. at 12028. Then, in accordance with 19 U.S.C. § 1677a(c)(2)(A), Commerce deducted certain expenses from that price to reach EP.

Commerce deducted the following costs from Apex's price to determine EP:

> foreign inland freight expenses, export inspection agency (EIA) fees, foreign brokerage and handling expenses, various foreign miscellaneous shipment charges, international freight expenses, terminal handling charges, marine insurance expenses, U.S. customs duties (including harbor maintenance fees and merchandise processing fees), U.S. brokerage and handling expenses, and U.S. inland freight expenses . . . .

76 Fed. Reg. at 12028.

Commerce deducted the following costs from Falcon's price to calculate EP:

> cold storage expenses, loading and unloading expenses, trailer hire expenses, foreign inland freight expenses, port charges, export survey charges, terminal handling charges, foreign brokerage and handling expenses, international freight expenses, marine insurance expenses, U.S. customs duties (including harbor maintenance fees and merchandise processing fees), and U.S. brokerage and handling expenses . . . .

*Id.*

Neither Apex nor Falcon made sufficient sales in their home market—India—during the period of review to allow a proper comparison with U.S. sales. Therefore, to

determine NV, Commerce looked at other comparison markets. For Apex, Commerce selected the United Kingdom, and for Falcon, Commerce selected Japan as the comparison market. *Id.* The companies sold similar products at similar volumes in those countries, as compared to U.S. sales. *Id.* (citing 19 U.S.C. § 1677b(a)(1)(C); 19 C.F.R. § 351.404). Commerce made adjustments to the prices charged in those comparator countries to calculate NV, so that it could compare NV and EP at the same level of trade. 76 Fed. Reg. at 12028.

As it pertains to this appeal, there is one important difference between the sales to the United Kingdom and Japan, as compared to sales in the U.S. Both Apex and Falcon ship merchandise to the United Kingdom and Japan on a cost and freight ("C&F") basis. This means that the seller only covers the costs necessary to deliver merchandise to the named port of destination. *Apex Exports*, 2013 WL 6978901, at *7 n.6. In contrast, Apex and Falcon ship merchandise to the U.S. on a delivery-duty-paid ("DDP") basis, such that they act as both the exporters and importers of record for the merchandise. Under such a contract, the exporter is also responsible for paying the costs associated with importation. That includes paying import and export duties and complying with customs formalities. *Id.* at *7 n.7.

Apex and Falcon brought suit in the CIT, challenging the dumping margins assigned to them as excessive because of an alleged error by Commerce in calculating the normal value of their exports. The CIT rejected their claim, and they do not appeal. Ad Hoc Shrimp Trade Action Committee ("Ad Hoc"), an intervenor-defendant association of domestic shrimp producers which participated in the administrative proceeding, also challenged the dumping margins in the CIT. Ad Hoc argued that the EP of the merchandise sold by Apex and Falcon should be recalculated by the deduction of the amount of antidumping duties assessed on their exports and paid by Apex and

Falcon. Such a deduction would have the effect of increasing the dumping margins.

## III

Ad Hoc's challenge in the CIT was based on its plain language reading of the relevant statute, which provides that, when calculating EP, Commerce shall deduct "the amount . . . attributable to any additional costs, charges, or expenses, and United States import duties, which are incident to [importation]." 19 U.S.C. § 1677a(c)(2). Ad Hoc argued that antidumping duties assessed on imports are necessarily "additional costs, charges, or expenses" associated with importation, where, as in this case, the exporter is responsible for payment of the antidumping duties. Thus, Ad Hoc argued that the words of the statute are unambiguously clear, requiring deduction of antidumping duties in the calculation of EP, and denying Commerce any authority to refuse to make such deductions.

Ad Hoc's arguments to the CIT did not sound in a vacuum. Two precedents, one from the CIT and one from this court, stood in its way. In *Wheatland Tube Co. v. United States*, 495 F.3d 1355 (Fed. Cir. 2007), this court addressed under 19 U.S.C. § 1677a(c)(2) whether antidumping duties fell within the meaning of "United States import duties," in a fact setting where Commerce had refused to deduct § 201 safeguard duties when calculating EP.[1] We held that "Congress has not defined or explained

---

[1] Section 201 of the Trade Act of 1974 authorizes the President to impose safeguard duties if merchandise is imported to the U.S. in such large quantities that it injures domestic industry. *Wheatland Tube*, 495 F.3d at 1357. Both antidumping and § 201 safeguard duties are remedial duties, in contrast to normal customs duties that serve no remedial purpose. *Id.* at 1362. This court con-

the meaning or scope of 'United States import duties' as set forth in 19 U.S.C. § 1677a(c)(2), [and] [t]hus, because Congress has not 'directly spoken to the precise question at issue,' this court finds that the statute is ambiguous and proceeds to step two of *Chevron*." *Id.* at 1359–60. We further upheld Commerce's interpretation of the statute, which refused deduction of safeguard duties when computing EP, as reasonable. *Id.* at 1361.

In the light of *Wheatland Tube*, Ad Hoc did not argue that antidumping duties were included in "United States import duties" under the statute, and instead argued that under the same statute antidumping duties must be considered "additional costs, charges, or expenses." Here, Ad Hoc ran up against *Ad Hoc Shrimp Trade Action Committee v. United States*, 925 F. Supp. 2d 1367 (Ct. Int'l Trade 2013), in which it made the same statutory argument it presents in this case. The opinion in that case, relied upon by the CIT in the instant case, concluded that the statute does not speak directly to the question of whether antidumping duties must be considered "additional costs, charges, or expenses" under the statute. *Id.* at 1367. In that situation, the statute's ambiguity invoked the familiar *Chevron* step two inquiry, which asks whether Commerce's long-standing interpretation of the statute is reasonable. The CIT deemed Commerce's interpretation reasonable and thus worthy of deference. *Id.* at 1372.

Not surprisingly, the CIT in this case concluded that the statute does not define "costs, charges, or expenses" incident to importing merchandise. *Apex Exports*, 2013 WL 6978901, at *6 (citing *Wheatland Tube Co. v. United States*, 495 F.3d 1355, 1359–60 (Fed. Cir. 2007)). Therefore, the CIT considered whether Commerce's approach to

---

cluded it was reasonable for Commerce to treat antidumping and § 201 safeguard duties similarly for the purposes of 19 U.S.C. § 1677a. Id.

calculating EP was based on a reasonable construction of the statute. *Id.* (citing *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984)).

The CIT concluded that Commerce's construction of the statute was reasonable. *Apex Exports*, 2013 WL 6978901, at *6. For one, the CIT determined Commerce's approach works as intended to bring NV and EP into alignment. *Id.* Moreover, if Commerce deducted antidumping duties as Ad Hoc suggested, importers such as Apex and Falcon "would pay more in duties than the antidumping statute intends." *Id.* at *7. The CIT found that Ad Hoc's proposed approach to calculating EP would lead to circular calculations and double counting of the antidumping margins. *Id.* Therefore, the CIT concluded it was reasonable for Commerce to apply the statute to avoid that result. *Id.*

## IV

On appeal, Ad Hoc again argues that the plain meaning of the statute governs, and Commerce must deduct antidumping duties when it calculates EP where those duties are included in the price of the merchandise. Alternatively, Ad Hoc argues that Commerce's interpretation of the statute is unreasonable, and thus not entitled to deference. Ad Hoc emphasizes that Apex and Falcon sell shrimp in the U.S. on a DDP basis. Under these agreements, Apex and Falcon expressly agree to cover antidumping duties. Therefore, Ad Hoc argues, the price on those contracts includes the antidumping duty, and it should be deducted from EP as a cost incident to bringing merchandise to the U.S. We disagree.

## A

This Court reapplies the standard of review applied by the CIT when reviewing Commerce's final determinations. *Dupont Teijin Films USA, LP v. United States*, 407 F.3d 1211, 1215 (Fed. Cir. 2005). "Commerce's determina-

tion should therefore be upheld unless it is unsupported by substantial evidence on the record or is not in accordance with law." *Id.* (citing 19 U.S.C. § 1516a(b)(1)(B)(i) (2012); *Micron Tech. Inc. v. United States*, 117 F.3d 1386, 1393 (Fed. Cir. 1997)). Regarding Commerce's statutory interpretations, we apply the two-part framework laid out in *Chevron. Union Steel v. United States*, 713 F.3d 1101, 1106–07 (Fed. Cir. 2013) (citing *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842–43 (1984)).

B

The first step in the *Chevron* analysis asks if the statute in question is ambiguous. If not, the statute speaks for itself in its plain language, and the interpretation springing from the unambiguous language governs. Where the statute is ambiguous, the second step asks if the interpretation proffered by the government is reasonable. If so, it is entitled to deference and is applied as a matter of law. Whether a statute is ambiguous can be ascertained in different ways. The Supreme Court instructs that ambiguity resides where Congress has not "directly addressed the precise question at issue." *Chevron*, 467 U.S. at 843. If the language of a statute suggests that Congress may have directly addressed the issue at hand, but nonetheless has not done so to produce an "unambiguously expressed intent of Congress," *id.*, the statute cannot be said to be unambiguous. By either test, 19 U.S.C. §1677a(c)(2) is ambiguous on the question of whether antidumping duties must be deemed "additional costs, charges, or expenses" for purposes of calculating EP.

Congress did not address the specific question before this Court. The statute does not define "any additional costs, charges, or expenses." Moreover, nothing in the statute or legislative history instructs Commerce whether to deduct antidumping duties from EP as such a cost, charge, or expense.

This Court previously held that "Congress has not defined or explained the meaning or scope of 'United States import duties' as set forth in 19 U.S.C. § 1677a(c)(2)(A)." *Wheatland Tube Co. v. United States*, 495 F.3d 1355, 1359 (Fed. Cir. 2007). We agree that Congress was similarly silent on the precise definition of § 1677a(c)(2)(A)'s "any additional costs, charges, or expenses"—and specifically silent as to whether antidumping duties fall within that definition.

Viewed the other way, the statute is equally ambiguous. Ad Hoc insists that Congress unambiguously meant what it said: namely, that "any" cost, charge or expense it pays to get the shrimp to the United States must under the explicit words of the statute be deducted in computing EP. But Ad Hoc's view overlooks that we have held that Congress intended to exclude antidumping duties from the calculation of EP, when such duties were labeled as "United States import duties." Ad Hoc's position depends on its implicit assertion that what Congress intended for antidumping duties when associated with terms most closely describing them (import duties) is exactly the opposite of what Congress meant for antidumping duties, when associated with the more general description of "cost[], charge[], or expense[]." Further, Ad Hoc assumes that Congress meant for antidumping duties necessarily to be costs, charges or expenses "incident to bringing the subject merchandise from the original place of shipment . . . to the place of delivery in the United States." The statute is not so clear, and leaves for question whether antidumping duties are instead incident to pricing decisions made by the exporter, and not costs related solely to importation. Ad Hoc cannot overcome these questions, which stand in the way of any assertion that Congress unambiguously stated that antidumping duties must be deducted from the computation of EP.

C

Because the statute is ambiguous, we turn to the second step of the *Chevron* analysis, and consider "whether the agency's answer is based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843. Since it is reasonable, consistent with the goals of the statute, and reflects Commerce's long-standing practice, we conclude Commerce's refusal to deduct antidumping duties from EP is entitled to deference.

Commerce considers antidumping duties as distinct from normal selling expenses and customs duties. Normal customs duties have no remedial purpose. *Wheatland Tube*, 495 F.3d at 1362. Antidumping duties, on the other hand, are special duties that implement a trade remedy. *See Stainless Steel Wire Rod from the Republic of Korea*, 69 Fed. Reg. 19153, 19159 (Apr. 12, 2004) (final admin. review). As the CIT has described it, antidumping duties are "an element of a fair and reasonable price," not an import duty or cost associated with importation. *Hoogovens Staal BV v. United States*, 4 F. Supp. 2d 1213, 1220 (Ct. Int'l Trade 1998). Furthermore, legislative history signals that antidumping duties are special remedial duties, distinct from U.S. import duties. *See, e.g.*, S. Rep. No. 67-16, at 4, 10–11 (1921); *Wheatland Tube*, 495 F.3d at 1361. It is therefore reasonable for Commerce not to treat antidumping duties as costs of importation when calculating EP.

The statute in question instructs Commerce to make two reductions when calculating EP: (1) subtract the amount attributable to U.S. import duties and (2) subtract the amount attributable to additional costs, charges, or expenses incident to importation. 19 U.S.C. § 1677a(c)(2)(A). Since antidumping duties are not deducted from EP as "United States import duties," it is reasonable for Commerce to likewise refuse to deduct antidumping duties as "costs, charges, or expenses . . .

incident to bringing the subject merchandise" to the U.S. *See* § 1677a(c)(2)(A). It is strange to suggest otherwise—that antidumping *duties* are not U.S. import duties, but instead costs incident to importation that must therefore be deducted from EP. It is reasonable for Commerce to avoid such a construction of the statute.

What is more, Commerce declines to deduct antidumping margins when calculating the margins because that would be inappropriately circular and result in a double counting of the remedy.[2] In arguing otherwise, Ad Hoc misses the point of the antidumping statute. The goal of imposing the duty is to prevent dumping by effectively raising the price of subject merchandise in the U.S. to the

---

[2]    Before the CIT and in their briefs to this Court, both parties offer elaborate hypothetical calculations about the effect that deducting antidumping duties would have on calculating the margin. Commerce, Apex, and Falcon explain that Ad Hoc's proposed approach would eventually result in an EP of zero. During the first calculation, Commerce would take NV minus EP. The result would be a first antidumping margin ("AD-1"). Then, Ad Hoc's approach would require Commerce to go back and recalculate EP minus AD-1. This would render EP-2, and require another margin calculation of NV minus EP-2. This calculation would render another, higher antidumping margin, AD-2. There is no mathematical reason why the calculation should end there. The new antidumping margin would feed in to a third iteration of the calculation, and so on until the antidumping margin was equal to NV. We agree that Commerce could approach this sort of calculation without necessarily creating absurd results, as it does with the reimbursement circumstance mentioned later in this opinion. However, the cyclical nature of the underlying calculation highlights a flaw in Ad Hoc's proposal.

fair value. The importer has less incentive to charge an unfairly low price, because it will have to make up the difference through a duty payment.

> The principle underlying the proposed additional [antidumping] duty . . . is to add such an amount of duty as will equalize sales at less than the foreign home market value . . . , thereby making it unprofitable to dump goods on the markets of the United States at lower prices. If the seller of the goods is compelled to add as duty the difference between the sales price and what he would receive by selling in the otherwise highest obtainable market, all reward or inducement to dumping is removed.

H.R. Rep. No. 67-1, at 23 (1921). By raising the price for sales made on a DDP basis, to cover the risk of antidumping duties, Apex and Falcon would likely do just that—charge U.S. buyers more. This achieves the goal of the statute, and because the price already reflects an antidumping charge (in the form of a higher DDP price), following Ad Hoc's suggestion would in fact result in double counting that amount.

Finally, as the CIT noted, Commerce's current position is consistent with its longstanding practice of treating antidumping duties as special, and not deducting them to calculate EP. *Apex Exports*, 2013 WL 6978901, at *8; *see also Wheatland Tube*, 495 F.3d at 1362–63; *Ad Hoc Shrimp Trade Action Comm. v. United States*, 925 F. Supp. 2d 1367, 1373 n.19 (Ct. Int'l Trade 2013) (referring to "Commerce's practice of not reducing export price by the amount of antidumping deposits paid"); *Stainless Steel Wire Rod from the Republic of Korea*, 69 Fed. Reg. at 19159 n.23 (final admin. review) (listing cases where the CIT agreed that Commerce need not deduct antidumping duties when calculating for export price). We conclude that Commerce's refusal to deduct antidumping duties

when calculating EP reflects a permissible construction of 19 U.S.C. § 1677a(c)(2)(A).

We reject Ad Hoc's contention that Commerce's interpretation is unreasonable. Ad Hoc largely argues that Commerce's approach does not constitute a fair comparison between NV and EP—rehashing similar arguments made as to statutory construction. Ad Hoc suggests that Commerce is not making an apples-to-apples comparison when calculating antidumping margins. Regarding the question of double counting, and Commerce's refusal to deduct antidumping margins from EP because that would duplicate the remedy, Ad Hoc counters that there is no evidence double counting would occur. However, as we have already explained, exporters would likely increase the price of subject merchandise in DDP contracts to cover the risk of antidumping duties. Commerce's interpretation, and approach to calculating EP, are reasonable and achieve the goals of the statute.

## D

Ad Hoc makes an additional argument, citing Commerce's so-called "reimbursement regulation." 19 C.F.R. § 351.402(f). Ad Hoc does not contend that the reimbursement regulation applies in this case. Instead, it argues that since the regulation requires deduction of antidumping duties in some cases, Commerce must also allow those deductions in this case.

The reimbursement regulation provides that Commerce will deduct antidumping duties from EP in one circumstance—when an exporter or producer agrees to either pay antidumping duties "directly on behalf of [an] importer" or reimburses an importer for the expense. *Id.* The regulation contemplates a foreign exporter or producer that sells merchandise to another entity, and it is that entity which is responsible for importing merchandise into the U.S. When an exporter or producer pays the antidumping duties on behalf of the importer, it triggers

§ 351.402(f). In that circumstance, Commerce will deduct the duty amount the exporter pays directly or reimburses when calculating export price, effectively treating the payment as a price rebate. *Id.*

Ad Hoc argues that "[b]y asserting that assessed antidumping duties will be deducted from export price if the exporter pays them on behalf of the importer, but not if the exporter acts as the importer of record and pays them on behalf of the U.S. buyer, Commerce elevates form over substance and treats economically identical situations differently." However, we agree with the CIT that just because Commerce deducts reimbursed antidumping duties under this regulation, that does not mean it is unreasonable for Commerce to decline to deduct antidumping duties in other circumstances. *Apex Exports*, 2013 WL 6978901, at *9.

The rationale behind the reimbursement regulation is reasonable. Where the antidumping duty is paid by the exporter, the importer acquires merchandise in the U.S. at less than a fair price, thus frustrating the purposes of the antidumping law. By assuming the cost of the antidumping duties—either through direct payment or reimbursement—the exporter effectively reduces the U.S. price. *See Hoogovens Staal BV v. United States*, 4 F. Supp. 2d 1213, 1217 (Ct. Int'l Trade 1998); *Color Television Receivers from the Republic of Korea*, 61 Fed. Reg. 4408, 4410 (Feb. 6, 1996) (final admin. review) (describing the purpose behind the reimbursement regulation).

The reimbursement regulation at § 351.402(f) is designed to "ensure that the . . . incentive for importers to buy at non-dumped prices is not negated by exporters who . . . remov[e] the importer's exposure to antidumping liability." *Ad Hoc Shrimp Trade Action Comm. v. United States*, 925 F. Supp. 2d 1367, 1375 (Ct. Int'l Trade 2013). The regulation creates an added disincentive for the exporter. If the exporter pays or reimburses for antidump-

ing duties, Commerce will basically double count the antidumping margin. *Id.* at 1376; *see also Hoogovens Staal BV*, 4 F. Supp. 2d at 1217 ("Presumably, an exporter will be reluctant to continue paying the cost of antidumping duties because the margin will increase . . . each time Commerce reviews it."). The rationale of the reimbursement regulation, to discourage exporters from reimbursing antidumping duties, is reasonable.

On the other hand, Commerce's general approach of refusing to deduct antidumping duties addresses a mirror image situation. Where the importer has to pay antidumping duties itself, the standard disincentive operates to protect domestic producers because the U.S. price increases. Commerce refuses to double count the duty where it is already being paid by the importer. As above, we conclude that Commerce's approach is reasonable.

For the purposes of the present case, it is better to view Apex and Falcon through their role as importers. Here, both companies are paying antidumping duties as an importer. These duties, in turn, discourage them from charging a harmfully low price to U.S. buyers. There is no need to impose dumping remedies twice—the rationale of the reimbursement regulation does not apply here.

Ad Hoc suggests that Commerce has no grounds to distinguish the facts of this case from the reimbursement context. That is incorrect. Ad Hoc's argument focuses on comparing the position of Apex and Falcon to that of reimbursing exporters. As importers, Apex and Falcon face the risk of antidumping duties just like every other importer. Because the reimbursement regulation addresses a different factual situation and is designed to serve a distinct purpose, this case is easily distinguished from the fact setting in which the reimbursement regulation applies.

CONCLUSION

Because Commerce's interpretation of the antidumping statute is a permissible construction, the CIT's decision to sustain Commerce's refusal to deduct antidumping duties when calculating export price is affirmed.

**AFFIRMED**

No costs.