# United States Court of Appeals
# for the Federal Circuit

---

**UNITED STATES,**

*Plaintiff-Cross-Appellant*

**v.**

**AMERICAN HOME ASSURANCE COMPANY,**

*Defendant-Appellant*

---

2014-1292, 2014-1355

---

Appeals from the United States Court of International Trade in No. 10-cv-00185, Senior Judge Richard W. Goldberg.

---

Decided: June 17, 2015

---

EDWARD FRANCIS KENNY, International Trade Field Office, Commercial Litigation Branch, Civil Division, United States Department of Justice, New York, NY, argued for plaintiff-cross-appellant. Also represented by STUART F. DELERY, JEANNE E. DAVIDSON, AMY M. RUBIN.

HERBERT C. SHELLEY, Steptoe & Johnson, LLP, Washington, DC, argued for defendant-appellant. Also represented by MARK FREDERICK HORNING, JEFFREY M. THEODORE.

---

Before MOORE, SCHALL, and REYNA, *Circuit Judges.*

SCHALL, *Circuit Judge.*

American Home Assurance Company ("AHAC") appeals, and the government cross-appeals, the final decision of the United States Court of International Trade in *United States v. American Home Assurance Co.*, 964 F. Supp. 2d 1342 (Ct. Int'l Trade 2014) ("*American Home*"). In its decision, the Court of International Trade made three rulings on summary judgment. *First*, the court held that AHAC was liable to the government under the continuous bond that it had issued to secure the payment of antidumping duties owed by JCOF (USA) International, Inc. ("JCOF"). Specifically, the court ruled that AHAC was liable under the bond for antidumping duties in connection with two entries of freshwater crawfish tail meat from China. *Id.* at 1347–49. *Second*, the court held that the government was not entitled to statutory prejudgment interest under 19 U.S.C. § 580 on the amount due under the bond. *Id.* at 1351–54. *Third*, the court held that AHAC was liable to the government for equitable prejudgment interest on the amount due under the bond. *Id.* at 1354–57. AHAC appeals the court's rulings on liability and equitable prejudgment interest; the government cross-appeals its ruling on statutory prejudgment interest.

For the reasons set forth below, we (1) affirm the Court of International Trade's ruling that AHAC is liable to the government under its bond; (2) reverse the court's ruling that the government is not entitled to statutory prejudgment interest on the amount due; and (3) vacate the court's ruling that AHAC is liable to the government for equitable prejudgment interest on the amount due. The case is remanded to the Court of International Trade for further proceedings consistent with this opinion.

BACKGROUND

The facts of the case are generally undisputed and are set forth in the Court of International Trade's decision. *See Am. Home*, 964 F. Supp. 2d at 1345–46. We recite here the facts pertinent to the issues before us.

I.

Following a 1996 investigation, the U.S. Department of Commerce ("Commerce") determined that freshwater crawfish tail meat imported from China was being sold in the United States at less than fair market value. *See Freshwater Crawfish Tail Meat from the People's Republic of China*, 62 Fed. Reg. 41,347 (Aug. 1, 1997). As a result, Commerce ordered that entries of freshwater crawfish tail meat from China be subject to antidumping duties upon entry into the United States.[1]

II.

JCOF is an importer based in New York. In 2001, it arranged to import into the United States shipments of freshwater crawfish tail meat from a Chinese exporter, Yangzhou Lakebest Foods Company, Ltd. ("Yangzhou"). Yangzhou did not export freshwater crawfish tail meat to

---

[1] Dumping occurs when foreign-produced goods are sold in the United States at a price below the sales price in the country of origin. *E.g.*, *Dongbu Steel Co. v. United States*, 635 F.3d 1363, 1365 (Fed. Cir. 2011). If domestic companies believe they are being injured by dumping activity, they can lodge complaints with Commerce requesting the imposition of antidumping duties. *Id.* Commerce then conducts an investigation based on the complaints to determine whether, and to what extent, dumping is occurring. It orders antidumping duties if a domestic industry is being injured by less-than-fair-market prices. *Id.*

the United States during the period of Commerce's 1996 investigation.  For that reason, for purposes of exporting freshwater crawfish tail meat to the United States in 2001, it qualified as a "new exporter" of merchandise under 19 U.S.C. § 1675(a)(2)(B).  Yangzhou's "new exporter" status gave JCOF options for how it could post the security necessary for the Bureau of Customs and Border Protection ("Customs") to release the imported goods from its custody.  It had the option of "posting, until the completion of the [administrative] review [of the new exporter], . . . a bond or security in lieu of a cash deposit."  19 U.S.C. § 1675(a)(2)(B)(iii).

Exercising that option, JCOF chose to use a surety company to post the required security.  In April 2001, it contracted with AHAC, a New York-based surety, for the issuance of a one-year, continuous bond in the amount of $600,000.[2]  The bond became effective on May 4, 2001, and provided Customs with security for future duties owed on entries of freshwater crawfish tail meat from Yangzhou.  **[J.A. 23]**  Under the terms of the bond, AHAC and JCOF were jointly and severally obligated, and had a liability cap of $600,000.  *Am. Home*, 964 F. Supp. 2d at 1345.

During the period covered by the bond, JCOF made two entries of crawfish tail meat from Yangzhou at the Port of Los Angeles/Long Beach.  *Id.*  The entries occurred on November 1, and 2, 2001, and were identified as M42–1164064–2 and M42–1164065–9, respectively.  At the time of entry, JCOF declared a 0% *ad valorem* antidump-

---

[2]    A "continuous bond," as compared to a "single transaction bond," covers "liabilities resulting from multiple import transactions over a period of time, such as one year."  *Nat'l Fisheries Inst., Inc. v. U.S. Bureau of Customs & Border Prot.*, 465 F. Supp. 2d 1300, 1302 (Ct. Int'l Trade 2006); *see also* 19 C.F.R. § 113.12.

ing duty rate, which was the deposit rate then in effect for shipments by Yangzhou. *Id.* Based on JCOF's bond, Customs allowed the freshwater crawfish tail meat to be released from its custody and to enter the stream of commerce in the United States.

Shortly thereafter, Commerce conducted an administrative review of freshwater crawfish tail meat entries during the period of September 1, 2001, through August 31, 2002.[3] During the review, liquidation of JCOF's two entries was suspended while Yangzhou's final antidumping duty rate was determined.[4] When Commerce eventually published the final results of its administrative review in February 2004, it assigned Yangzhou a 223.01% *ad valorem* antidumping duty rate. *See Freshwater Crawfish Tail Meat from the People's Republic of China*, 69 Fed. Reg. 7,193, 7,194 (Feb. 13, 2004).

On May 12, 2004, Commerce issued instructions directing Customs to liquidate JCOF's November 2001 entries at the new rate assigned to Yangzhou. Customs thereafter liquidated the entries on June 25, 2004, and billed JCOF for duties owed. *Am. Home*, 964 F. Supp. 2d at 1346. Following JCOF's failure to pay the duties,

---

[3] An interested party may request Commerce to conduct an "administrative review" of an outstanding antidumping order. *See* 19 U.S.C. § 1675. The final results of such a review "shall be the basis for the assessment of countervailing or antidumping duties on entries of merchandise covered by the determination and for deposits of estimated duties." *Id*. at § 1675(a)(2)(C).

[4] "Liquidation" means the final computation or ascertainment of the duties accruing on an entry. 19 C.F.R. § 159.1. Under Commerce's accounting system, and as a result of suspended liquidations, the actual liquidation of entries subject to an antidumping order may occur years after the date of importation.

Customs sought payment from AHAC, as JCOF's surety. In November 2004, AHAC denied liability and responded to Customs' demand for payment under the bond by filing Protest No. 2704-04-102655 (the "102655 protest").

At about the same time, Shanghai Taoen International Trading Co., Ltd. ("Shanghai Taoen"), one of the other exporters of freshwater crawfish tail meat subject to Commerce's 2004 administrative review, filed suit in the Court of International Trade challenging the results of the review. *Id.* Shanghai Taoen's suit precipitated a preliminary injunction enjoining liquidation of the entries of crawfish tail meat exported by it. *Id.* Yangzhou was not named in the injunction, however, as it was not a party to the pending litigation. *Id.* Subsequently, in February 2005, the Court of International Trade sustained Commerce's final results. *Shanghai Taoen Int'l Trading Co., Ltd. v. United States*, 360 F. Supp. 2d 1339, 1348 (Ct. Int'l Trade 2005). The court's affirmance dissolved the outstanding injunction, and Customs was instructed to liquidate Shanghai Taoen's entries at the applicable rate.

Following dissolution of the *Shanghai Taoen* injunction, and even though the injunction had not applied to shipments from Yangzhou, Customs reliquidated JCOF's two November 2001 entries on June 3, 2005, believing that the original liquidations in June 2004 may have been in violation of the *Shanghai Taoen* injunction. *See* Joint Appendix ("J.A.") 109–112.[5] As a result of those mistaken

---

[5]    In an August 7, 2007, letter to JCOF and AHAC, Customs wrote that it believed the preliminary injunction issued by the Court of International Trade in *Shanghai Taoen* covered JCOF's entries. As a result, Customs said it had thought it should "unset" its original June 2004 liquidations as being in violation of the court's order. J.A. 110. Reliquidation of JCOF's entries in June 2005 fol-

reliquidations, Customs voided its prior bills for duties owed and issued new bills to JCOF. When JCOF failed to pay the duties, Customs again sought payment from AHAC. Several weeks later, in July 2005, apparently not appreciating the effect of its reliquidation action, Customs denied the 102655 protest. That protest had remained unresolved following the original June 2004 liquidations. In September 2005, Customs issued a second demand to AHAC for payment of duties on the entries reliquidated in June 2005.

AHAC did not appeal the denial of the 102655 protest by filing suit in the Court of International Trade. Instead, in December 2005, it filed a second protest, Protest No. 2704-05-102579 (the "102579 protest"), contesting Customs' further demand for payment under the continu-

---

lowed the court's February 2005 opinion in *Shanghai Taoen* sustaining the findings of Commerce's administrative review and lifting the injunction. Customs stated in its 2007 letter that, when it reliquidated, it believed it had authority to do so under 19 U.S.C. § 1504(d) because the June 2005 reliquidations were being made within six months of the court's February 2005 order, which it mistakenly perceived as removing a suspension of liquidation covering JCOF's entries. It is now undisputed that the *Shanghai Taoen* preliminary injunction never applied to JCOF's entries and that 19 U.S.C. § 1501 therefore provided the proper timeframe within which Customs could have reliquidated the entries: "within ninety days from the date on which notice of the original liquidation is given or transmitted to the importer." That is, in this case, within ninety days of notice of the June 2004 liquidations, Customs could have reliquidated. It is undisputed that Customs' June 2005 reliquidations fell outside of the § 1501 timeframe and were thus erroneous, in addition to being unnecessary.

ous bond following the erroneous reliquidations. In July 2006, Customs denied AHAC's protest. AHAC did not file an action in the Court of International Trade contesting the denial.

On February 9, 2007, Customs sent a third demand letter to AHAC. In it, Customs sought a total payment of $1,157,898.22 for unpaid duties and interest in connection with JCOF's two November 2001 freshwater crawfish tail meat entries. *Am. Home*, 964 F. Supp. 2d at 1346. AHAC denied liability and refused to make payment under the bond.

### III.

On June 21, 2010, the government filed suit in the Court of International Trade to recover from AHAC, as JCOF's surety, the duties and interest allegedly owed on the November 2001 entries. The parties, in due course, cross-moved for summary judgment on various issues. Seeking summary judgment on the merits, AHAC asserted that the government's collection action was moot due to the 2005 reliquidations. It argued that the erroneous reliquidations voided the previous timely liquidations of June 2004, resulting in a scenario where no valid liquidation or reliquidation occurred. According to AHAC, since no valid liquidation was on record, the entries at issue should have been deemed liquidated by operation of law under 19 U.S.C. § 1504(d) at the initially-declared 0% rate six months after the suspension of liquidation was removed in February 2004.

The government moved for summary judgment on entitlement to prejudgment statutory interest under 19 U.S.C. § 580. Section 580 provides that "[u]pon all bonds, on which suits are brought for the recovery of duties, interest shall be allowed . . . from the time when said bonds became due." The government argued that the statute's plain language mandated that it be awarded interest for AHAC's delayed payment under the continu-

ous bond. The government also claimed entitlement to equitable prejudgment interest.

In the decision now on appeal, the Court of International Trade ruled on the summary judgment motions. The court first determined that AHAC was legally obligated to pay under its continuous bond. *Am. Home*, 964 F. Supp. 2d at 1347. It agreed with AHAC that the 2005 reliquidations superseded and voided the original liquidations. It ruled, however, that AHAC was required to preserve its rights by timely protesting the reliquidations by instituting litigation. *Id.* at 1347, 1349. The court concluded that, under our decision in *Juice Farms, Inc. v. United States*, 68 F.3d 1344 (Fed. Cir. 1995), the 2005 reliquidations became final, "whether legal or not," once AHAC failed to challenge them in court. *Am. Home*, 964 F. Supp. 2d at 1347 (quoting *Juice Farms*, 68 F.3d at 1346). The court held that since AHAC failed to timely challenge the reliquidations in court, it had failed to preserve its rights and was thus liable under the continuous bond. *Id.* at 1349.

Having found AHAC liable, the Court of International Trade next held that the government was not entitled to statutory prejudgment interest under § 580. *Id.* at 1350–55. In the court's view, the historical context of the statute did not allow the word "duties" to encompass antidumping duties. The court determined that, "in the period since the statute's enactment over 200 years ago, Congress, courts, and the Government itself have counseled that antidumping duties are not comparable to normal customs duties in function, purpose, and character." *Id.* at 1352. In reaching its decision, the court relied on *Dynacraft Industries v. United States*, 118 F. Supp. 2d 1286 (Ct. Int'l Trade 2000), and *Wheatland Tube Co. v. United States*, 495 F.3d 1355 (Fed. Cir. 2007). The court stated that, in *Dynacraft*, it had previously interpreted "duties" in an interest statute, 19 U.S.C. § 1505, as encompassing only "ordinary" customs duties. *Am. Home*,

964 F. Supp. 2d at 1353 (citing *Dynacraft*, 118 F. Supp. 2d at 1292). Citing our decision in *Wheatland Tube*, the court noted that the government itself had previously advocated for the interpretation of "duties" adopted in *Dynacraft*. *Id.* (citing *Wheatland Tube*, 495 F.3d at 1361–63).

The Court of International Trade did rule, though, that the government was entitled to equitable prejudgment interest (in excess of the $600,000 bond limit) for AHAC's use of the money owed after payment had become due. *Id.* at 1354–57. The court determined that both equity and fairness weighed in favor of awarding equitable interest to the government. *Id.* at 1356–57.

AHAC timely appealed the Court of International Trade's decision on liability and equitable interest; the government timely cross-appealed the court's denial of § 580 interest. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(5).

## DISCUSSION

In the Court of International Trade, summary judgment is available when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." U.S. Ct. Int'l Trade R. 56(a). We review the Court of International Trade's grant or denial of summary judgment "for correctness as a matter of law, deciding *de novo* the proper interpretation of the governing statute and regulations as well as whether genuine issues of material fact exist." *St. Paul Fire & Marine Ins. Co. v. United States*, 6 F.3d 763, 767 (Fed. Cir. 1993); *see also Esso Standard Oil Co. (PR) v. United States*, 559 F.3d 1297, 1300 (Fed. Cir. 2009). As noted, in this case the material facts are not in dispute.

I.

A.

AHAC argues that the Court of International Trade erred in finding it liable under the continuous bond for antidumping duties. It contends that, despite being unnecessary and erroneous, the June 2005 reliquidations were valid for purposes of superseding and voiding the timely June 2004 liquidations. In the same breath, though, it urges that because the reliquidations occurred more than ninety days after the June 2004 liquidations, they were nevertheless invalid under 19 U.S.C. § 1501 for purposes of conferring liability. AHAC states that § 1501 requires that reliquidations not occurring "within ninety days from the date on which notice of the original liquidation is given" are considered void.[6] *Id.* Thus, in AHAC's view, no valid liquidation or reliquidation occurred, and, consequently, the "deemed liquidation" provisions of 19 U.S.C. § 1504(d) must therefore apply.

Subsection 1504(d), titled "Removal of suspension," provides a timeframe within which, following the removal of a suspension of liquidation, Customs must properly liquidate an entry or otherwise accept the rate initially declared by the importer. It states that the "Customs Service shall liquidate the entry, unless liquidation is

---

[6] The first sentence of § 1501 provides, in full: "A liquidation made in accordance with section 1500 or 1504 of this title or any reliquidation thereof made in accordance with this section may be reliquidated in any respect by the Customs Service, notwithstanding the filing of a protest, within ninety days from the date on which notice of the original liquidation is given or transmitted to the importer, his consignee or agent." It is undisputed that the June 2005 reliquidations occurred outside of that statutory timeframe.

extended under subsection (b) of this section, within 6 months after receiving notice of the removal from the Department of Commerce, other agency, or a court with jurisdiction over the entry." Continuing, it provides: "Any entry . . . not liquidated by the Customs Service within 6 months after receiving . . . notice [of the removal of a suspension order] shall be treated as having been liquidated at the rate of duty . . . asserted at the time of entry by the importer of record." According to AHAC, the two shipments of freshwater crawfish tail meat imported by JCOF in November 2001 were "deemed liquidated" in August 2004 at the 0% rate declared at the time of entry, because there was no valid liquidation of the entries within six months of the removal of the suspension order in February 2004.

AHAC also argues that it was not required to challenge in court the "legally void" 2005 reliquidations in order to preserve its contention that the reliquidations were invalid for purposes of conferring liability. AHAC contends that the Court of International Trade erred in finding that its failure to appeal the denied 102579 protest resulted in the reliquidations being "final and conclusive" because the entries were deemed liquidated before that time. It relies on *United States v. Cherry Hill Textiles, Inc.* in support of its position that, if entries are deemed liquidated, a subsequent reliquidation need not be protested in order to preserve defenses to future collection actions. 112 F.3d 1550, 1560 (Fed. Cir. 1997).

The government responds by arguing that no "deemed liquidation" occurred. It contends that the original June 2004 liquidations were timely made under § 1504(d) because they took place within six months of the removal of the suspension of liquidation that was in place during Commerce's 2004 administrative review. It asserts that AHAC prevented those liquidations from becoming final and conclusive by filing the 102655 protest in November 2004, and that the government reliquidated the entries in

June 2005 before the pending protest was denied. Although AHAC protested the later, mistaken 2005 reliquidations in the 102579 protest in December 2005, the government argues that AHAC's failure to contest the denial of the 102579 protest at the Court of International Trade allowed those reliquidations to become final and conclusive pursuant to 19 U.S.C. § 1514(a) and relevant case law.[7]

## B.

We agree with the Court of International Trade that AHAC is liable to the government under the continuous bond. Contrary to AHAC's protestations, no "deemed liquidation" occurred here. Under § 1504(d), an entry is only deemed to be liquidated by operation of law when it is "not liquidated by the Customs Service within 6 months after receiving [a notice of removal of a suspension of liquidation]" from Commerce. We have explained that, under § 1504(d), three elements are required in order for a deemed liquidation to occur: "(1) the suspension of liquidation that was in place must have been removed; (2) Customs must have received notice of the removal of the suspension; and (3) Customs must not liquidate the entry at issue within six months of receiving such notice." *Fujitsu Gen. Am., Inc. v. United States*, 283 F.3d 1364, 1376 (Fed. Cir. 2002).

The liquidation of JCOF's November 2001 entries was suspended pending the conclusion of Commerce's admin-

---

[7] In relevant part, 19 U.S.C. § 1514(a) provides that liquidation and reliquidations "shall be final and conclusive upon all persons (including the United States and any officer thereof) unless a protest is filed in accordance with this section, or unless a civil action contesting the denial of a protest, in whole or in part, is commenced in the United States Court of International Trade."

istrative review. *See Freshwater Crawfish Tail Meat from the People's Republic of China*, 69 Fed. Reg. 7,193, 7,194 (Feb. 13, 2004). Thereafter, following completion of the administrative review, and publication thereof in the Federal Register on February 13, 2004, *id.*, Commerce instructed Customs, on May 12, 2004, to proceed with liquidating the entries. Customs did not delay liquidation for over "six months after receiving notice." 19 U.S.C. § 1504(d). Instead, it timely liquidated both entries within five months, on June 25, 2004. Thus, the third element required for a "deemed liquidation" to occur is clearly absent. *See Fujitsu Gen. Am.*, 283 F.3d at 1376 ("Customs must not liquidate the entry at issue within six months of receiving such notice.").

To avoid this straightforward result, AHAC contends that the 2005 reliquidations superseded and voided the original timely liquidations, with the result that it is as if Customs' prior actions never took place. In other words, AHAC asks us to hold that the 2005 reliquidations retroactively created a void in the chain of events, producing the possibility that a final and conclusive deemed liquidation occurred before the reliquidations. We are unable to accept the invitation. By liquidating in June 2004, Customs did take the action required under the statute to avoid liquidation by operation of law. Moreover, at the time of Customs' mistaken reliquidations, the 102655 protest, filed by AHAC in November 2004, was pending. *See* 19 U.S.C. § 1514(a) (providing that liquidations become final "unless a protest is filed"). Thus, at the time of the June 2005 reliquidations, Customs had acted to liquidate the entries and the original liquidations were not yet final. In short, nothing had triggered the operation of the "deemed liquidation" provision of § 1504(d).

AHAC's theory of "retroactive deemed liquidation" would create a universe where a reliquidation made by Customs could be simultaneously valid for purposes of retroactively vacating an earlier liquidation, thereby

giving rise to a "deemed liquidation" under § 1504(d), but invalid for purposes of conferring liability. AHAC's theory, and the rule it creates, would subvert the purpose behind § 1504(d). As we explained in *Cherry Hill*, "[t]he 'deemed liquidated' provision . . . was added to the customs laws in 1978 to place a limit on the period within which importers and sureties would be subject to the prospect of liability for a customs entry." 112 F.3d at 1559. If Customs takes action within that "period," importers are timely aware of their liability. Here, Customs' original, timely liquidation placed the "prospect of liability" clearly and fairly upon AHAC. *Id.* Indeed, the June 2005 reliquidations were calculated under the same 223.01% *ad valorem* antidumping duty rate as the original June 2004 liquidations. AHAC knew full well of its liability; it faced none of the concerns that § 1504(d) aims to alleviate.

*Cherry Hill*, upon which AHAC relies, does not in fact support its position. In *Cherry Hill*, Customs failed to make an original liquidation for over thirteen months after September 18, 1987, when the goods at issue were entered as duty free. *Id.* at 1551. Eventually, on October 28, 1988, Customs liquidated the entry as dutiable in the amount of $12,220.62. *Id.* The government gave notice of the liquidation to Cherry Hill and subsequently demanded payment from Cherry Hill's surety, International Cargo & Surety Insurance Co. ("IC&S"), under the bond it had given. IC&S refused to make payment. It did not, however, protest under 19 U.S.C. § 1514 either the liquidation or the demand for payment. *Id.* After the passage of the ninety-day period within which a protest could be filed, the government filed an enforcement action in the Court of International Trade seeking recovery of the assessed duties. The court granted summary judgment to the government for the full amount of its claim for duties, plus interest. *Id.*

On appeal, IC&S contended that summary judgment should not have been granted in favor of the government because the entry at issue was "deemed liquidated" duty free by operation of law when Customs failed to liquidate it within the one-year period required by 19 U.S.C. § 1504(a). We agreed with IC&S that it was not required to protest the October 1988 liquidation in order to defend against Customs' enforcement action by arguing that Customs was legally foreclosed from liquidating the entry anew after the entry had been deemed liquidated. *Id.* at 1558, 1560. We held that a "'deemed liquidation' defense did not have to be raised through a protest, and that the trial court should have considered that issue on the merits." *Id.* at 1558. Relying on *United States v. Sherman & Sons Co.*, 237 U.S. 146 (1915), we created a narrow exception to the usual timely protest requirement set forth in 19 U.S.C. § 1514. *Cherry Hill*, 112 F.3d at 1558–59. We explained that an exception was necessary to prevent Customs from "purport[ing] to liquidate an entry anew, years after the first liquidation had become final, and thereby impos[ing] liability on the importer or surety if the importer or surety were not vigilant in watching for notice of such untimely liquidations or if it were no longer able to undertake the burden of filing and pursuing a protest." *Id.* at 1560.

However, the entry in *Cherry Hill*, unlike the entries here, "was deemed liquidated . . . one year after the entry" because the government took no action at all within the statutory period set forth in § 1504(a). *Id.* at 1559. Rather, Customs purported to make a new liquidation a month later, outside the one-year period from entry, and attempted to treat that new liquidation as the operative liquidation. We held that Customs lost its opportunity to do so because the "deemed liquidation" was already final and conclusive. *Id.* at 1560 ("In cases in which a liquidation has become final, the government cannot seek to recover additional duties simply by making a new liquida-

tion of the original entry."). Unlike in *Cherry Hill*, where a deemed liquidation occurred pursuant to § 1504(a), in this case there was no deemed liquidation under § 1504(d). The reason is that the original liquidations of June 2004 were timely (because they were made within six months of the notice of removal of the suspension of liquidation). Moreover, they were not final at the time of the reliquidations (because of AHAC's pending protest). In short, this is not a case where Customs "purport[ed] to liquidate an entry anew, years after the first liquidation had become final." *Id.*

Because we conclude that no "deemed liquidation" occurred, AHAC's theory of zero liability must fail. This case is governed, not by *Cherry Hill*, but by the ordinary timely protest requirements. *See* 19 U.S.C. § 1514(a). In *Juice Farms*, we directly addressed whether the time limit for protests set forth in § 1514(a) "applies to allegedly illegal liquidations," such as Customs' 2005 reliquidations of JCOF's entries. 68 F.3d at 1345. We held that "all liquidations, whether legal or not, are subject to the timely protest requirement" and that "[w]ithout a timely protest, all liquidations become final and conclusive under 19 U.S.C. § 1514." *Id.* at 1346.

In sum, even though it is undisputed that Customs' 2005 reliquidations were erroneous, AHAC's failure to challenge those reliquidations in the Court of International Trade resulted in those liquidations becoming final and conclusive. *Id.*; *see also Cherry Hill*, 112 F.3d at 1559 ("this court does not recognize a distinction between 'void' and 'voidable' liquidations for purposes of determining the applicability of the protest requirement"); *Omni U.S.A., Inc. v. United States*, 840 F.2d 912, 915 (Fed. Cir. 1988) (same); *United States v. A.N. Deringer, Inc.*, 593 F.2d 1015, 1020 (CCPA 1979) (same). We therefore affirm the Court of International Trade's decision that AHAC is legally obligated to pay under its continuous bond.

II.

We turn now to the government's cross-appeal, addressing the issue of whether statutory prejudgment interest under 19 U.S.C. § 580 applies to antidumping duties. As noted, § 580, titled "Interest in suits on bonds for recovery of duties," provides that "[u]pon all bonds, on which suits are brought for the recovery of duties, interest shall be allowed . . . from the time when said bonds became due." The Court of International Trade held that § 580 does not apply to bonds that secure antidumping duties. On appeal, we review the court's statutory interpretation de novo.[8] *Princess Cruises, Inc. v. United States*, 397 F.3d 1358, 1357 (Fed. Cir. 2005).

A.

The government contends that the Court of International Trade erred in holding that AHAC is not liable for § 580 interest on the delayed payment of the antidumping duties owed under the continuous bond. In particular, the government argues that the court erred in finding that "duties" in § 580 refers only to traditional customs duties, and not to "special" duties, such as antidumping duties. It argues that the court mistakenly focused its inquiry on the types of "duties" instead of on the fact that the statute provides for interest on "all bonds." In the government's view, the statute is broad enough on its face to cover all customs bonds, not simply bonds relating to traditional

---

[8] Because neither Customs nor any other agency has been charged with administering § 580, we, like the Court of International Trade, construe the statute without deference. *See Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 844 (1984) (requiring *Chevron* deference to an agency's reasonable interpretation only in the case of "construction of a statutory scheme it is entrusted to administer").

customs duties. The government argues that, when § 580 was enacted, Congress understood and intended "duties" to include protectionist elements similar to modern day antidumping statutes. It argues that § 580 furthers the goals of those shared protectionist principles and motivates sureties to timely pay under issued bonds. It further argues that, even if "duties" was once meant to include only traditional customs duties, the scope of a statute can expand over time to include circumstances that did not exist when it was first enacted.

AHAC, for its part, agrees with the Court of International Trade that § 580 is limited to bonds securing traditional customs duties, and does not cover bonds securing antidumping duties. It asserts that the original act, codified in 1799, was for the purpose of regulating the "collection of duties on imports and tonnage." Act of March 2, 1799, ch. 22, § 65, 1 Stat. 627. According to AHAC, this means the act was directed to traditional, revenue-raising duties. Citing *Canadian Wheat Board v. United States*, AHAC contends that antidumping duties are not considered revenue-raising duties and fall outside of § 580's scope. 641 F.3d 1344, 1351 (Fed. Cir. 2011) ("Antidumping duty orders are imposed 'for reasons other than the raising of revenue.' They are imposed to protect American industries against unfair trade practices by foreign entities who sell in the American market."). AHAC also points out that the "recovery of duties" language in the modern version of § 580 was not altered when § 580 was recodified four years after the antidumping statutes were first enacted in 1921. According to AHAC, this suggests that § 580 exists separate and apart from the antidumping scheme.

AHAC further contends that the Court of International Trade's interpretation of § 580 is supported by the positions taken by the government in prior cases. For example, AHAC notes that, in *Wheatland Tube*, the government argued that antidumping duties should be

distinguished from "normal," or "general," customs duties and therefore should be treated differently. 495 F.3d at 1361–62; *see also Dynacraft*, 118 F. Supp. 2d at 1291. And, it asserts that we have recognized the government's recent change of position regarding whether § 580 applies to bonds securing the payment of special duties, as well as to bonds securing the payment of traditional duties. It points out that, in *United States v. Great American Insurance Co. of New York*, we noted that the government "only recently . . . beg[an] to invoke section 580 in cases involving antidumping . . . duties," which we characterized as "a seemingly major change in the government's asserted position on the scope and relationship of old laws." 738 F.3d 1320, 1327 (Fed. Cir. 2013). AHAC contends that our decision in *Great American* suggests the correctness of the Court of International Trade's decision in this case.

In addition, AHAC argues that the separate treatment of traditional and special duties reflects their different underlying roles. It argues that antidumping duties, while serving some protectionist purposes, are primarily remedial in nature. It posits that Customs has long viewed antidumping duties as "different from normal customs duties because they implement a trade remedy." *Stainless Steel Wire Rod from the Republic of Korea*, 69 Fed. Reg. 19,153, 19,159 n.22 (April 12, 2004). It states that we have said that "[a]ntidumping duties aim to remedy sales by a foreign exporter in the U.S. market at less than fair value. . . . Normal customs duties, [by] contrast, have no remedial purpose." *Wheatland Tube*, 495 F.3d at 1362.

## B.

We hold, as a matter of law, that 19 U.S.C. § 580 provides for interest on bonds securing both traditional customs duties and antidumping duties. We therefore reverse the contrary holding of the Court of International Trade.

Our analysis begins with the language of § 580. *E.g., Lamie v. U.S. Trustee*, 540 U.S. 526, 534 (2004) ("The starting point in discerning congressional intent is the existing statutory text . . . ."); *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997) ("Our first step in interpreting a statute is to determine whether the language at issue has a plain and unambiguous meaning . . . ."). When the statutory language is plain, we must enforce it according to its terms. *E.g., Dodd v. United States*, 545 U.S. 353, 359 (2005); *Lamie*, 540 U.S. at 534. "In reviewing the statute's text, we give the words 'their "ordinary, contemporary, common meaning," absent an indication Congress intended them to bear some different import.'" *Indian Harbor Ins. Co. v. United States*, 704 F.3d 949, 954 (Fed. Cir. 2013) (quoting *Williams v. Taylor*, 529 U.S. 420, 431 (2000)).

Section 580 is a short, free-standing statute within the Administrative Provisions section of Chapter 3 in Title 19. It does not cross-reference other statutory provisions and provides, in full: "Upon *all bonds*, on which suits are brought for the *recovery of duties*, interest shall be allowed at the rate of 6 per centum a year, from the time when said bonds became due." 19 U.S.C. § 580 (emphases added). The language—"all bonds" on which the government sues for "the recovery of duties"—is clear and unqualified. As written, the term "duties" does not modify the type of "bonds" on which interest shall be allowed. Instead, the statute calls for interest on "*all* bonds." The term "duties" reflects only the requisite *res litigiosae*—i.e., the general nature of the disputed property in the government's legal action against the surety. Thus, by the statute's plain terms, it covers, among other things, bonds securing the payment of antidumping duties when the government sues for payment under those bonds. *See Camargo Correa Metais, S.A. v. United States*, 200 F.3d 771, 773 (Fed. Cir. 1999) ("If the words

are unambiguous, no further inquiry is usually required.").

The fact that Congress first enacted § 580 in 1799 and the fact that the statute at that time applied only to bonds securing payment of then-existing customs duties do not alter the plain-meaning analysis. As the Court of International Trade recognized, statutory scope can and does expand over time to encompass circumstances that did not exist at the date of enactment. *Am. Home*, 964 F. Supp. 2d at 1351; s*ee also West v. Gibson*, 527 U.S. 212, 218 (1999) ("Words in statutes can enlarge or contract their scope as other changes, in law or in the world, require their application to new instances . . . ."). It is well established that, even though a "statute is presumed to speak from the time of its enactment," a statute later "embraces all such persons or things as subsequently fall within its scope, and ceases to apply to such as thereafter fall without its scope." *De Lima v. Bidwell*, 182 U.S. 1, 197 (1901); *see also Barr v. United States*, 324 U.S. 83, 90 (1945) ("[I]f Congress has made a choice of language which fairly brings a given situation within a statute, it is unimportant that the particular application may not have been contemplated by the legislators."); *Newman v. Arthur*, 109 U.S. 132, 138 (1883) (statutes apply to later-created circumstances if the "language fairly and clearly includes them"). Thus, the creation of the current system of levying antidumping duties in 1921, more than a hundred years after enactment of what is now § 580, *see* Antidumping Act of 1921, Pub. L. No. 67–10, 42 Stat. 11, is not an obstacle to concluding that the plain terms of § 580 encompass bonds for securing the payment of such duties.

Moreover, since § 580 was enacted in 1799, there have been only minimal changes to the statutory language. The original act, which was titled "An Act to regulate the collection of duties on imports and tonnage," provided: "And on all bonds upon which suits shall be commenced,

an interest shall be allowed at the rate of six per cent. per annum, from the time when said bonds become due, until the payment thereof." Act of March 2, 1799, ch. 22, § 65, 1 Stat. 627, 677. The current version of the statute was adopted in 1873. At that time, Congress retained the phrase "all bonds" and incorporated the word "duties" from the title of the original act into the phrase "for the recovery of duties," which is now in the body of the statute.[9] *Compare id.* at 627 (titled "An Act to regulate the collection of duties on imports and tonnage"), *with* 1 Rev. Stat. 181, § 963 (1875), *and* 19 U.S.C. § 580 (2012). Thus, there have been no changes in the statutory language which, on their face, would serve to move bonds for securing antidumping duties outside the scope of the statute. Congress, for instance, did not alter the language or the scope of § 580 following the enactment of the Antidumping Act of 1921 or following § 580's incorporation into Title 19 from Title 28 in 1948. Act of June 25, 1948, ch. 646, § 1, 62 Stat. 869; *see also Am. Home*, 964 F. Supp. 2d at 1350 (explaining that "Congress has not substantially updated § 580 or otherwise signaled whether the statute applies to antidumping duties").

There is also no legislative history surrounding § 580 to suggest a reading that deviates from the plain language of the statute. Neither party contends that any legislative history is instructive as to whether the "all

---

[9]    The 1873 version of the statute appeared in the 1875 Revised Statutes with other provisions governing "The Judiciary." It first entered the United States Code in Title 28, *Judiciary and Judicial Procedure, see* 28 U.S.C. § 787 (1926), fifty-one years later. In 1948, Congress revised Title 28, and § 580 was moved without change from Title 28 to its current location in Title 19, which is now titled *Customs Duties. See* Act of June 25, 1948, ch. 646, § 1, 62 Stat. 869.

bonds" language was intended to mean only bonds securing traditional, revenue-raising duties, to the exclusion of antidumping duties. At the same time, the limited number of interpretations of § 580 suggests a broad and independent purpose for § 580 that is consistent with its plain language. In 1983, for example, Customs expressed the view that § 580 is "not an interest charge for the use of funds, but an exaction aimed *at motivating apparently recalcitrant debtor sureties to pay* rather than force the Government to sue to collect." *Proposed Customs Regulations Amendments To Establish Interest Charges on Certain Delinquent Accounts*, 48 Fed. Reg. 10,077, 10,078 (Mar. 10, 1983) (emphasis added); *see also* Act of March 2, 1799, ch. 22, § 65, 1 Stat. 627, 676 (providing § 580 interest for the situation "where any bond for the payment of duties shall not be satisfied on the day it may become due"). That purpose—which applies equally to "all bonds," whether securing traditional duties or antidumping duties—is echoed by our decision in *United States v. Federal Insurance Co.*, 857 F.2d 1457, 1459 (Fed. Cir. 1988). In *Federal Insurance*, we suggested no limitation as to the types of customs bonds covered by § 580, but stated simply that "whenever a court awards unpaid import duties in a suit upon a bond, interest must be attached pursuant to section 580." *Id.* Neither AHAC nor the Court of International Trade have pointed us to an interpretation of the language of § 580 that teaches something other than the statute's ordinary meaning.

The Court of International Trade's opinion and AHAC's arguments on appeal are based largely on the fact that, in certain other instances, "duties" has been separated into "regular" and "special" duties. *Am. Home*, 964 F. Supp. 2d at 1352–53; Defendant-Appellant Resp. & Repl. Br. 25–27. For example, both AHAC and the court cite to *Dynacraft*, 118 F. Supp. 2d 1286. In that case, the Court of International Trade determined that "regular duties" included customs duties and that "special duties"

included antidumping duties. *Id.* at 1291. After reviewing the use of the word "duties" in the pre- and post-Uruguay Rounds Agreement Act statutory schemes, the court held that "antidumping and countervailing duties were never intended to be regular or general duties." *Id.* at 1292. The Court of International Trade in this case found that logic to be persuasive against the approach of interpreting the "open-ended word 'duties'" in § 580 "to include all types of duties." *Am. Home*, 964 F. Supp. 2d at 1354.

In *Dynacraft*, however, the court was not confronted with the question of whether there is a difference between, on the one hand, bonds securing the payment of "regular" duties and, on the other, bonds securing the payment of "special" duties. Instead, the court addressed the rather narrow and technical issue of whether overpayment of estimated antidumping duty cash deposits made pursuant to 19 U.S.C. § 1673b(d)(1)(B) constituted "duties" under 19 U.S.C. §§ 1505(b) and (c), so that the party making the overpayment became entitled to interest on "excess moneys."[10] 118 F. Supp. 2d at 1291–92. The plaintiff in that case, Dynacraft Industries, Inc. ("Dynacraft"), argued that it was entitled to interest under § 1505(c) on the cash deposits it had posted pursuant to § 1673b(d)(1)(B) before an antidumping duty order was published. The Court of International Trade agreed with the government, however, that 19 U.S.C. §§ 1673f and 1677g, which are part of the antidumping laws,

---

[10] Subsection 1505(b), addressing "refunds of duties," provides, in relevant part, that "[r]efunds of excess moneys deposited, together with interest thereon, shall be paid within 30 days of liquidation or reliquidation." Subsection 1505(c) provides interest on "excess moneys" "from the date the importer of record deposits estimated duties, fees, and interest."

governed the payment of interest in the case. Sections 1673f and 1677g, respectively, cover the treatment of estimated and final duties under antidumping duty orders and provide for interest on overpayments. Those provisions, the court stated, "prohibit the payment of interest for security posted before the publication of an antidumping order." *Id.* at 1287. Rejecting Dynacraft's arguments, the court determined that § 1505(b) did not control, but it did not decide the case based on the ground that the word "duties" in § 1505(b) excludes antidumping duties. *Id.* at 1292. It explicitly based its decision on four other grounds related to the interplay between 19 U.S.C. §§ 1505, 1673f, and 1677g. *See id.* It left open the question of "whether or not for some purposes 19 U.S.C. § 1505(b) and (c) include antidumping duties among the '[d]uties, fees, and interest determined to be due upon liquidation or reliquidation.'" *Id.*

Neither does *Wheatland Tube* support the result urged by AHAC. *Wheatland Tube* was cited by the Court of International Trade and is relied upon by AHAC. In *Wheatland Tube*, the issue was whether "§ 201 safeguard duties" are "United States import duties" under 19 U.S.C. § 1677a(c)(2)(A), which covers the determination of export price for antidumping purposes. *See* 495 F.3d at 1357.[11] The government took the position that § 201 duties are "special antidumping duties" because they are "more like . . . [antidumping duties] in purpose and function than they are like ordinary customs duties." *Id.* at 1362 (alterations in original). Ultimately, we determined that "Commerce's interpretation that 'United States import

---

[11]    Section 201 of the Trade Act of 1974, 19 U.S.C. § 2251, authorizes the President to impose "safeguard duties" if merchandise is imported to the United States in such large quantities that it injures domestic industry. *Wheatland Tu*be, 495 F.3d at 1357.

duties' does not include § 201 safeguard duties for the purposes of determining the [export price] and calculating . . . dumping margin is reasonable." *Id.* at 1363. *Wheatland Tube* did not address surety bonds or distinctions between bonds that secure the payment of various types of duties owed. Rather, it focused on a different statutory scheme; it addressed whether "safeguard duties" paid under § 201 of the Trade Act of 1974, 19 U.S.C. § 2251, are considered "United States import duties" under 19 U.S.C. § 1677a(c)(2)(A) for purposes of calculating dumping margins. Nothing in *Wheatland Tube* justifies deviating from the plain language of § 580 in this case.

As AHAC points out, in *Great American* we did state that the government's decision "to invoke section 580 in cases involving antidumping (or, apparently, countervailing) duties" seemed like a "major change in the government's asserted position on the scope and relationship of old laws." 738 F.3d at 1327. We did not, however, take the position that § 580 is not applicable to bonds securing the payment of antidumping duties. Rather, we said that "[t]he characterization [of § 580 interest as a penalty] leaves, rather than disposes of, questions about whether section 580 applies to antidumping duties at all and whether, if so, case-specific equitable considerations are relevant to its application, as is common under other, variously worded authorizations to apply penalties." *Id.* (footnote omitted). We determined in *Great American* that the prejudgment interest issue needed further development at the trial level "because the government's request . . . raise[d] significant questions about, for example, the equitable considerations attending equitable interest and/or section 580 interest, the novelty of application of section 580 to antidumping duties, and the soundness of the theory that both types of interest should be awarded." *Id.* at 1328. In this case, unlike *Great American*, development of the necessary legal and factual

issues relating to the application of § 580 interest has taken place.

In sum, nothing before us overcomes the clear language of 19 U.S.C. § 580. We, accordingly, reverse the decision of the Court of International Trade and hold that the government is entitled to statutory prejudgment interest under § 580. On remand, the Court of International Trade will calculate the precise amount of such interest owed.

## III.

We address next the issue of whether the government is entitled to equitable prejudgment interest, in view of our holding that it is entitled to statutory prejudgment interest under 19 U.S.C. § 580.

### A.

We have explained that, "[i]n the absence of a statute governing the award of prejudgment interest, 'the question [of prejudgment interest] is governed by traditional judge-made principles.'" *Princess Cruises*, 397 F.3d at 1367 (quoting *City of Milwaukee v. Cement Div., Nat'l Gypsum Co.*, 515 U.S. 189, 194 (1995)). In that situation, we have viewed the award of prejudgment interest as an equitable determination to be exercised at the discretion of the trial judge. *United States v. Reul*, 959 F.2d 1572, 1577 (Fed. Cir. 1992) ("Although no statute authorizes the award of prejudgment interest in this case, the Court of International Trade in exercising its equitable powers may in its sound discretion award prejudgment interest."); *United States v. Imperial Food Imports*, 834 F.2d 1013, 1016 (Fed. Cir 1987) ("[I]n cases such as this in which no statute specifically authorizes an award of prejudgment interest, such an award lies within the discretion of the court as part of its equitable powers.").

Relatedly, while we have stated that "[t]he degree to which the trial court is to balance equitable factors to

determine whether to award prejudgment interest is not easy to discern from the case law," there is no doubt that equitable considerations are central to such an award. *Princess Cruises*, 397 F.3d at 1368; *see also Imperial Foods*, 834 F.2d at 1016 (prejudgment interest is "a matter of equity and fairness"). Prejudgment interest typically "compensate[s] for the loss of use of money due as damages from the time the claim accrues until judgment is entered, thereby achieving full compensation for the injury those damages are intended to redress." *West Virginia v. United States*, 479 U.S. 305, 310 n.2 (1987).

Finally, the Supreme Court has cautioned against an overly mechanical application of equitable prejudgment interest. *See Blau v. Lehman*, 368 U.S. 403, 414 (1962) ("interest is not recovered according to a rigid theory of compensation for money withheld, but is given in response to considerations of fairness"). In *National Gypsum*, the Court stated that equitable prejudgment interest is not "automatic," but "depends upon the circumstances of each case, and rests very much in the discretion of the tribunal." 515 U.S. at 196. In *Kansas v. Colorado*, the Court was "unable to conclude with sufficient certainty that Colorado was on notice that such interest would be imposed as a matter of course" and found that the "Special Master acted properly in carefully analyzing the facts of the case and in only awarding as much prejudgment interest as was required by a balancing of the equities." 533 U.S. 1, 14 (2001).

In the context of bonds securing antidumping duties, we have recently explained that there are "equitable considerations that affect equitable prejudgment interest." *Great Am.*, 738 F.3d at 1326. We noted in *Great American* that "prejudgment interest 'traditionally has been considered part of the compensation due plaintiff.'" *Id.* (quoting *Osterneck v. Ernst & Whinney*, 489 U.S. 169, 175 (1989)). And, in *Great American*, we listed certain factors that may be considered in determining an award

of equitable prejudgment interest: "[1] the degree of personal wrongdoing on the part of the defendant, [2] the availability of alternative investment opportunities to the plaintiff, [3] whether the plaintiff delayed in bringing or prosecuting the action, and [4] other fundamental considerations of fairness." *Id.* (quoting *Osterneck*, 489 U.S. at 176).

Some of the factors discussed in *Great American* were considered by the Court of International Trade in this case. *Am. Home*, 964 F. Supp. 2d at 1356. For example, in exercising its discretion to award equitable prejudgment interest, the court considered "delay[] in bringing suit," "good faith defenses to liability," and "Customs' erroneous reliquidations." *Id.* In addition, the court noted that "[a]lthough case law diverges on what equitable factors the Court should consider in awarding prejudgment interest, it is clear that full compensation should be the court's overriding concern." *Id.* The court explained that it thought its award "str[uck] a fair balance between the parties" and that "equity favor[ed] awarding the [g]overnment interest in this action." *Id.* at 1357.

## B.

For the reasons set forth in Part II.B above, we have held that the government is entitled to statutory prejudgment interest under 19 U.S.C. § 580. That holding has altered the landscape of the case. The Court of International Trade's award of equitable prejudgment interest was made without the court having the opportunity to consider the effect of an award of § 580 interest and whether dual sources of interest are proper. *See, e.g.*, *Great Am.*, 738 F.3d at 1327 (requiring further factual development as to whether § 580 "applies in addition to equitable prejudgment interest"); *Great Am.*, No. 09-00187, 2012 WL 1229132, at *3 (Ct. Int'l Trade Apr. 11, 2012) ("The Government's contention that it is entitled to

both statutory and equitable interest is incorrect because it is in the absence of a statute that provides for interest that a court may exercise its equitable powers to award prejudgment interest.").

Under the circumstances, we think that the best approach is to vacate the Court of International Trade's award of equitable prejudgment interest and remand the case to the court so that it, in the first instance, may determine the issue of the government's entitlement to equitable prejudgment interest. We therefore vacate the court's award of equitable prejudgment interest.[12] On remand, the court will be in a position to entertain and consider all relevant arguments of the parties on the question of equitable prejudgment interest.[13]

---

[12] The court's ultimate ruling may alter its standing award of equitable postjudgment interest to the extent that its ruling on such interest might continue to be "based on the same considerations of equity and fairness" as the award of equitable prejudgment interest. *Am. Home*, 964 F. Supp. 2d at 1357 (quoting *United States v. C.H. Robinson Co.*, 880 F. Supp. 2d 1335, 1348 (Ct. Int'l Trade 2012)).

[13] Among other things, AHAC has argued on appeal that the government is not entitled to equitable prejudgment interest because such an award would create an inappropriate windfall to the government because any recovery of such interest may ultimately end up in a separate, non-interest-bearing account for the benefit of domestic producers under the Continued Dumping and Subsidy Offset Act of 2000 ("CDSOA"), Pub. L. No. 106–387, §§ 1001–03, 114 Stat. 1549, 1549A–72 to –75 (Oct. 28, 2000), *repealed by* Deficit Reduction Act of 2005, Pub L. No. 109–171, § 7601(a), 120 Stat. 4, 154 (Feb. 8, 2006) (effective Oct. 1, 2007). The government has responded that AHAC waived its CDSOA argument and that, in any

CONCLUSION

For the foregoing reasons, we affirm-in-part, reverse-in-part, and vacate-in-part the decision of the Court of International Trade.  The case is remanded for further proceedings on (1) the amount of prejudgment interest to which the government is entitled under 19 U.S.C. § 580 and (2) the issue of whether the government is entitled to equitable prejudgment interest in addition to statutory prejudgment interest under § 580.

**AFFIRMED-IN-PART, REVERSED-IN-PART,
VACATED-IN-PART, AND REMANDED**

COSTS

Each party shall bear its own costs.

---

event, the argument lacks merit.  On remand, should it wish to do so, AHAC is free to raise its CDSOA argument. Needless to say, we express no views on the merits of the argument, or on the merits of any other argument AHAC or the government may wish to assert in the Court of International Trade.